## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01517-COA

NALONNIE MOORE OSBORNE                                        APPELLANT

v.

LESLIE OSBORNE                                                APPELLEE

DATE OF JUDGMENT:            10/09/2014
TRIAL JUDGE:                 HON. G. CHARLES BORDIS IV
COURT FROM WHICH APPEALED:   JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      THOMAS WRIGHT TEEL
ATTORNEY FOR APPELLEE:       GARY L. ROBERTS
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:     DISMISSED APPELLANT'S COMPLAINT
                             FOR DIVORCE
DISPOSITION:                 AFFIRMED - 06/28/2016
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., BARNES AND GREENLEE, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     Nalonnie ("Lonnie") Osborne appeals from the Jackson County Chancery Court's dismissal of her complaint for divorce. After an evidentiary hearing on the merits, the chancellor determined that Lonnie had failed to prove the ground of habitual cruel and inhuman treatment. We affirm the chancellor's judgment.

## FACTS AND PROCEEDINGS BELOW

¶2.     Leslie ("Les") and Lonnie Osborne were married in June 1999 in Las Vegas, Nevada. No children were born of the marriage. The couple separated in January 2012. Upon separation, Les stayed at the marital home in Pascagoula, Mississippi, and Lonnie moved

back into a house she owned predating the marriage in Gautier, Mississippi.

¶3.    Lonnie filed a complaint for divorce in 2012 on the ground of irreconcilable differences, and later amended the complaint to include the ground of habitual cruel and inhuman treatment. The chancellor held an evidentiary hearing on February 26, 2014, concerning solely whether Lonnie had grounds for divorce. Les did not file a counterclaim alleging fault. He did not present any witnesses at the hearing. In support of Lonnie's case, the court heard the testimony of Les (called as an adverse witness), Lonnie, and the couple's coworkers and friends Joe Chapman and Rita Westwood.

¶4.    Lonnie asserted that, during the marriage, Les was uncommunicative, controlling, and belittling. She did not assert that he was physically abusive. Trouble in the marriage developed early when Les became "obsessed" with the project of rebuilding his Pascagoula house that had been destroyed in Hurricane George. Lonnie was unhappy with Les's unwillingness to spend time with her or to schedule family vacations. The project took three years, and due to the rift created by lack of time spent together, Lonnie continued to live in the Gautier house for an additional year before moving into the Pascagoula home.

¶5.    Both parties worked at Chevron. After Les lost his job, the couple began a side business of flipping and renting houses, as well as a charter-boat business. Les eventually took a job that required him to travel away from home four to six months a year. Lonnie was offended when Les would refuse to call or take her calls for days at a time when he was on the road. Les refused to give Lonnie compliments or to verbally acknowledge her hard work and contributions to their life. When she expressed concerns over the behavior of Les's son

2

who would occasionally live with them, Les would get angry and respond, "if you don't like it, you can leave." Lonnie "felt like that was like the lowest disrespect you could have for a spouse."

¶6.     Lonnie asserted that Les's controlling and belittling behaviors centered frequently around financial matters. He would refuse to give her cash to buy groceries because he "might not like what food she bought." Les once refused to give Lonnie $2 to buy a fan at a hot event, and was angry when their friend Rita gave Lonnie the $2 because he felt that it underminded his authority. He refused to let Lonnie sign Christmas gifts as being from both of them if she had not paid for the gift. Les would always refer to the couple's rental properties as "his," whereas Lonnie would refer to them as "ours."

¶7.     Les performed voluntary hurricane repairs in the community but told Lonnie he would only do repairs at her Gautier house if she paid him $25 an hour. Lonnie responded that she would charge him each time they had sexual relations. Lonnie testified that her multiple attempts at attending counseling with Les were unsuccessful because Les would get angry and hold his hand up to silence her or would walk out of the room and refuse to come back. Lonnie asserted that the way Les continually treated her over their years of marriage made her depressed and resulted in her having no self-esteem and feeling like she was unlovable. She stated that the stress of her marriage exacerbated her existing underlying health problems. She did acknowledge that she had issues with self-esteem, depression, and a dysfunctional family. She also had childhood issues going back to 1993.

¶8.     After the couple separated in January 2012, Lonnie continued to return to the

Pascagoula home on weekends in a final effort to reconcile prior to filing for divorce. Les conceded at the divorce hearing that he did not wish to stay married to Lonnie and that his reason for refusing to agree to a divorce was that he did not wish to submit the question of equitable distribution of marital property to the court.

¶9.     Joe Chapman and Rita Westwood both testified that, while Les had a reputation for being a difficult person, neither of them had observed any inappropriate behavior between the couple. Rita also testified that, as the marriage deteriorated, Lonnie became increasingly moody and withdrawn from social interactions and events.

¶10.    The chancellor held that Lonnie had not proven habitual cruel and inhuman treatment by a preponderance of the evidence. Lonnie appeals.

### DISCUSSION

¶11.    When reviewing a chancellor's dismissal of a divorce action, we will not reverse if his findings are supported by substantial evidence unless he abused his discretion, was manifestly wrong, or applied an erroneous legal standard. *Jones v. Jones*, 101 So. 3d 731, 732 (¶4) (Miss. Ct. App. 2012).

¶12.    In order for a divorce to be granted on the ground of habitual cruel and inhuman treatment, the following must be proven by a preponderance of the evidence: conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for

4

its continuance. *Richard v. Richard*, 711 So. 2d 884, 889 (¶22) (Miss. 1998).

¶13. "The conduct must consist of something more than unkindness or rudeness or mere incompatibility or want of affection." *Horn v. Horn*, 909 So. 2d 1151, 1155 (¶7) (Miss. Ct. App. 2005) (citing *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss. 1993)). We agree with the chancellor's conclusion that, in the case of Lonnie and Les, "[t]he treatment that each has rendered to the other constitutes nothing more than mere unkindness, rudeness, frivolous quarrels, lack of affection and incompatibility." These behaviors are insufficient to support the grant of a divorce on the ground of habitual cruel and inhuman treatment. Criticism and controlling behavior will "not fulfill the requirements of a divorce on the grounds of habitual cruel and inhuman treatment." *Morris v. Morris*, 804 So. 2d 1025, 1032 (¶22) (Miss. 2002). As the chancellor concluded, "[s]tanding one's ground and refusing to give in to the wishes of the other does not constitute cruelty."

¶14. When evaluating habitual cruel and inhuman treatment, chancellors look not only at the offending spouse's conduct but also at the impact made on the plaintiff spouse. *Reed v. Reed*, 839 So. 2d 565, 569 (¶17) (Miss. Ct. App. 2003). Here, Lonnie testified that she had suffered from feelings of being unhappy, stressed, and somewhat depressed dating to a period of years prior to her marriage with Les. Her work also contributed to her stress. We agree with the chancellor's finding that Lonnie was unable to prove that her relationship with Les caused these feelings and other health problems.

¶15. Lonnie does not allege that Les was physically abusive, and the chancellor noted that Lonnie's willingness to stay frequently with Les while making a last effort at reconciliation

in the months prior to filing for divorce indicates that Les's behavior did not endanger the life, limb, or health of Lonnie, nor did it create a reasonable apprehension of danger that rendered the relationship unsafe. We note also that Lonnie is not Les's financial dependent. She is a hard worker earning a good income and has owned her own house since before her marriage to Les. This diminishes concern over the potential harmful effects of Les's controlling financial tendencies. *See Hoskins v. Hoskins*, 21 So. 3d 705, 708 (¶14) (Miss. Ct. App. 2009).

¶16.    A marriage may become unpleasant and argumentative, but not rise to the level of being so unnatural and infamous as to warrant the grant of divorce on the ground of habitual cruel and inhuman treatment. *Killen v. Killen*, 54 So. 3d 869, 843 (¶14) (Miss. Ct. App. 2010). Les and Lonnie may have an unhappy and incompatible marriage, but Lonnie has failed to prove that Les's behavior rises to the level of habitual cruel and inhuman treatment.

**CONCLUSION**

¶17.    We agree with the chancellor that Lonnie failed to prove habitual cruel and inhuman treatment by a preponderance of the evidence. The chancellor's judgment dismissing the complaint for divorce is affirmed.

¶18.    **THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, JAMES AND WILSON, JJ., CONCUR.**