# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-01632-SCT

*KARRAH T. WANGLER*

*v.*

*RICHARD C. WANGLER*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/13/2018 |
| TRIAL JUDGE: | HON. SUSAN RHEA SHELDON |
| TRIAL COURT ATTORNEYS: | DAVID M. SESSUMS |
| | CHASE FORD MORGAN |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID M. SESSUMS |
| ATTORNEY FOR APPELLEE: | CHASE FORD MORGAN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 03/12/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     Karrah Wangler appeals the chancellor's dismissal of her complaint for divorce on the ground of habitual cruel and inhuman treatment.  Because Karrah failed to show sufficient evidence of habitual cruel and inhuman treatment, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Karrah and Richard Wangler were married September 30, 2016.  They have one child, Elizabeth,[1] born July 5, 2017.  Karrah and Richard separated on December 26, 2017.

¶3.     On January 3, 2018, Karrah filed a complaint for divorce on the ground of habitual

---

[1] For privacy purposes, we use a fictitious name for the minor child.

cruel and inhuman treatment or, alternatively, irreconcilable differences. Richard later filed an answer and a counterclaim for divorce on the ground of habitual cruel and inhuman treatment or, alternatively, irreconcilable differences. The chancellor temporarily ordered joint legal custody of Elizabeth to the parties, with Karrah having temporary physical custody, subject to Richard's visitation. The chancellor set the matter for trial.

¶4. On October 16, 2018, one day before trial, Richard moved to withdraw his counterclaim for divorce. That same day, Karrah moved to amend her complaint for divorce to allege spousal domestic abuse. The chancellor granted Richard's motion and allowed him to withdraw his counterclaim for divorce. The chancellor denied Karrah's motion to amend her complaint.

¶5. At the conclusion of her case-in-chief, Karrah moved ore tenus to amend her complaint to conform to the evidence under Mississippi Rule of Civil Procedure 15(b). The motion was granted, and Karrah's complaint for divorce was amended to conform to the evidence presented during her case-in-chief. Richard then moved to dismiss Karrah's complaint for divorce due to her failure to prove habitual cruel and inhuman treatment. The chancellor found that Karrah "ha[d] failed to present adequate proof of habitual cruel and inhuman treatment" and therefore granted Richard's motion and dismissed Karrah's complaint for divorce. Karrah timely appealed. On appeal, Karrah argues that the chancellor erred by (1) denying her motion to amend the complaint and (2) dismissing her complaint for divorce.

**DISCUSSION**

2

> *I.*   *Whether the chancellor erred by denying Karrah's motion to amend the complaint.*

¶6.   "[M]otions for leave to amend are left to the sound discretion of the trial court. This Court reviews such determinations under an abuse of discretion standard and unless convinced that the trial judge abused his discretion, we are without authority to reverse." *Church v. Massey*, 697 So. 2d 407, 413 (Miss. 1997) (internal quotation marks omitted) (quoting *McCarty v. Kellum*, 667 So. 2d 1277, 1283 (Miss. 1995)).

¶7.   [Mississippi] Rule [of Civil Procedure] 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded . . . if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Webb v. Braswell*, 930 So. 2d 387, 393 (Miss. 2006) (quoting *Moeller v. Am. Guar. and Liab. Ins. Co.*, 812 So. 2d 953, 962 (Miss. 2002)).

¶8.   Karrah argues that the chancellor should have granted her motion to amend the complaint because under Rule 15(a), "leave shall be freely given when justice so requires." Miss. R. Civ. P. 15(a). This Court disagrees and finds that the amendment was futile. Alternatively, any error by the chancellor was harmless.

¶9.   Mississippi Code Section 93-5-1 (Rev. 2018) provides twelve causes for divorce. Among those causes is habitual cruel and inhuman treatment. Miss. Code Ann. § 93-5-1. Effective July 1, 2017, the Legislature amended Section 93-5-1 to include "spousal domestic

3

abuse" as a form of habitual cruel and inhuman treatment. S.B. 2680, Reg. Sess., 2017 Miss. Laws ch. 427, § 6 (codified as amended at Miss. Code Ann. § 93-5-1 (Rev. 2018)).

¶10. Karrah filed her complaint for divorce on January 3, 2018, and alleged that Richard was "guilty of habitual cruel and inhuman treatment." More than nine months later, on October 16, 2018, Karrah moved to amend her complaint to allege spousal domestic abuse, specifically,

> that Richard . . . ha[d] engaged in a pattern of behavior against [her] of threats of intimidation, emotional or verbal abuse, forced isolation, and false accusations of marital infidelity, coupled with episodes of abandoning [her] at all times of the day or the night on the sides of public highways and in public places which pattern of behavior rises above the level of unkindness or rudeness or incompatibility or want of affection.

According to Karrah, "[o]ut of an abundance of caution and so as to avoid any 'surprises' or misunderstandings, [she] . . . filed her motion to amend to explicitly and almost verbatim track the language of amended section 93-5-1 . . . ." Karrah explained that she moved to amend her complaint in order "to spell out the new . . . standard for habitual cruel and inhuman treatment . . . ."

¶11. But as previously noted, the legislative amendment to Section 93-5-1 was effective July 1, 2017, approximately six months before Karrah and Richard separated and Karrah filed her complaint for divorce. Thus, Karrah had ample time to include in her complaint any allegation of spousal domestic abuse. Notwithstanding her failure to do so, the 2017 amendment to Section 93-5-1 was still applicable to Karrah's complaint alleging habitual cruel and inhuman treatment. In other words, because Karrah filed for divorce on the ground of habitual cruel and inhuman treatment after July 1, 2017, the effective date of the

4

amendment, the amended language of Section 93-5-1 applied to her complaint. Additionally, the record shows that the parties participated in discovery and exchanged documentation regarding Karrah's allegations of spousal domestic abuse. Thus, Karrah's last-minute motion to amend the complaint to "track the language of amended section 93-5-1" and to "spell out" the new standard was futile. Accordingly, the chancellor did not err by denying the motion.

¶12. Alternatively, even if the chancellor's denial of Karrah's motion to amend the complaint was erroneous, such error was harmless. The record shows, and Karrah admits, that "Karrah had already spelled out her evidence in her responses to discovery." Moreover, the record shows that Karrah testified at trial regarding her allegations of habitual cruel and inhuman treatment, including spousal domestic abuse. At the conclusion of Karrah's case-in-chief, the chancellor granted her motion to amend the pleadings to conform to the evidence under Mississippi Rule of Civil Procedure 15(b). As a result, the chancellor considered all of the testimony and evidence offered by Karrah in support of her claim for divorce on the ground of habitual cruel and inhuman treatment, including spousal domestic abuse. Therefore, as acknowledged by Karrah, any error by the chancellor in denying the motion to amend the complaint was harmless.

> II. *Whether the chancellor erred by dismissing Karrah's complaint for divorce.*

¶13. At the conclusion of Karrah's case-in-chief, Richard moved to dismiss her complaint. In granting Richard's motion and dismissing Karrah's complaint for divorce, the chancellor found as follows:

> [H]aving reviewed the pleadings, I've looked through all 13 exhibits that were

admitted into evidence by stipulation, looking at the notes that I took during testimony, the [c]ourt finds that [Karrah] has failed to present adequate proof of habitual cruel and inhuman treatment[,] and after reviewing the standard set by the case law in the State of Mississippi, the [c]ourt is of the opinion that [Karrah] is not entitled to a divorce on the grounds of [habitual] cruel and inhuman treatment. So the [c]ourt would grant the motion to dismiss by [Richard].

¶14. Mississippi Rule of Civil Procedure 41(b) states, in pertinent part,

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court may then render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

¶15. "The standard of review applicable on motion to dismiss under Rule 41(b) is different [from] that applicable to a motion for a directed verdict." *Stewart v. Merchs. Nat'l Bank*, 700 So. 2d 255, 258 (Miss. 1997) (citing *Century 21 Deep S. Props., Ltd. v. Corson*, 612 So. 2d 359 (Miss. 1992)).

> In considering a motion to dismiss, the judge should consider "the evidence fairly, as distinguished from in the light most favorable to the plaintiff," and the judge should dismiss the case if it would find for the defendant. "The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." "This Court applies the substantial evidence/manifest error standards to an appeal of a grant or denial of a motion to dismiss pursuant to [Rule] 41(b)."

*Id.* at 259 (emphasis omitted) (citations omitted). "[This Court] will overturn the chancellor's decision on a Rule 41(b) motion to dismiss only if the findings are not supported by substantial evidence, or the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard." *Pittman v. Pittman*, 195 So. 3d 727, 732 (Miss. 2016) (citing *Stewart*, 700 So. 2d at 259). "Legal questions, however, are reviewed de novo." *Id.*

6

(internal quotation marks omitted) (quoting *Sanford v. Sanford*, 124 So. 3d 647, 652-53 (Miss. 2013)).

¶16.    A divorce on the ground of habitual cruel and inhuman treatment requires the following to be shown by a preponderance of the evidence:

> [C]onduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Osborne v. Osborne*, 202 So. 3d 639, 641 (Miss. Ct. App. 2016) (citing *Richard v. Richard*, 711 So. 2d 884, 889 (Miss. 1998)).  Additionally,

> Spousal domestic abuse may be established through the reliable testimony of a single credible witness, who may be the injured party, and includes, but is not limited to:

> That the injured party's spouse attempted to cause, or purposely, knowingly or recklessly caused bodily injury to the injured party, or that the injured party's spouse attempted by physical menace to put the injured party in fear of imminent serious bodily harm; or

> That the injured party's spouse engaged in a pattern of behavior against the injured party of threats or intimidation, emotional or verbal abuse, forced isolation, sexual extortion or sexual abuse, or stalking or aggravated stalking as defined in Section 97-3-107, if the pattern of behavior rises above the level of unkindness or rudeness or incompatibility or want of affection.

Miss. Code Ann. § 93-5-1.

¶17.    "The conduct must consist of something more than unkindness or rudeness or mere incompatibility or want of affection." *Osborne*, 202 So. 3d at 641 (internal quotation marks omitted) (quoting *Horn v. Horn*, 909 So. 2d 1151, 1155 (Miss. Ct. App. 2005)).  "The

7

offending spouse's conduct . . . 'must be shown to have been systematic and continuous.'"

***Baggett v. Baggett***, 246 So. 3d 887, 892 (Miss. Ct. App. 2017) (quoting ***Horn***, 909 So. 2d

at 1155). "Further, the offended spouse must show a causal connection between the

offending spouse's conduct and the impact on the offended spouse." ***Id.*** (citing ***Smith v.***

***Smith***, 90 So. 3d 1259, 1263 (Miss. Ct. App. 2011)). "Although in cases of violence a single

incident may be sufficient for a divorce, generally the plaintiff must show a pattern of

conduct." ***Id.*** (internal quotation marks omitted) (quoting ***Smith***, 90 So. 3d at 1263).[2]

¶18.    Karrah argues that she sufficiently established habitual cruel and inhuman treatment,

specifically, spousal domestic abuse, by showing that Richard had engaged in "a pattern of

behavior against [her] consisting of threats or intimidation, emotional or verbal abuse, forced

isolation, false accusations of marital infidelity, [and] episodes of abandon[ment]." For

support, Karrah asserts multiple allegations of cruel and inhuman treatment. For clarity, this

Court has divided the allegations into categories.[3]

> *A.*     *Sleep Deprivation*

¶19.    Karrah first asserts that Richard "deprived [her] of sleep." She testified that "[o]n a

---

[2] The opinion concurring in part and dissenting in part asserts that "[t]he majority errs by relying on case law that was written before the 2017 amendment to Section 93-5-1." CIPDIP Op. ¶ 45. But regardless of when the amendment occurred, one seeking a divorce on the ground of habitual cruel and inhuman treatment must still show a pattern of conduct or behavior and that the pattern of conduct or behavior rises above the level of unkindness or rudeness or incompatibility or want of affection. Miss. Code Ann. § 93-5-1; ***Osborne***, 202 So. 3d at 641; ***Baggett***, 246 So. 3d at 892.

[3] The opinion concurring in part and dissenting in part suggests it was erroneous to segment Richard's offensive behavior into various categories. But as noted, we did so only for clarity purposes in order to address all of Karrah's allegations.

regular basis, multiple times a week after work, [she] would come home and there would just be criticism [that] would last hours." Karrah explained that as a result of the sleep deprivation, she "couldn't think straight" and "had no energy."

¶20. Yet Karrah offered no testimony to suggest that Richard's alleged criticism was the ultimate cause of her sleep deprivation. Instead, Karrah acknowledged that she "was already losing sleep with [Elizabeth]" and "then she would have to go to work again the next morning . . . ." Indeed, Karrah worked twelve-hour shifts as a registered nurse in the emergency room.

### B. Forced Isolation

¶21. Karrah further asserts that Richard was critical of and isolated her from her family. She claims that Richard would take away her cell phone and keys in an effort to keep her from contacting her family. She further claims that on one occasion, Richard turned off the internet so she could not communicate with anyone.

¶22. But the record shows that despite Richard's alleged criticism of Karrah and Karrah's forced isolation, she communicated regularly with her family and friends. Karrah testified that she and Richard lived with her parents for about four months. During this time, Karrah talked to her family "every day." After Karrah and Richard moved out of her parent's house, Karrah talked to her parents two to four times a week. Additionally, Karrah's mother testified that after Karrah and Richard moved out, she would go by their apartment once a week to visit for about an hour. Moreover, Karrah testified that she had "[l]ots of friends" and would hang out with those friends about once a month.

9

### C. False Accusations of Infidelity

¶23.   Karrah next asserts that Richard "made false accusations of infidelity."  "[F]alse accusations of infidelity, made habitually over a long period of time without reasonable cause . . . constitute cruel and inhuman treatment."  *Richard*, 711 So. 2d at 889 (citing *Hibner v. Hibner*, 217 Miss. 611, 64 So. 2d 756, 757 (Miss. 1953)).  Karrah testified that Richard falsely accused her of infidelity "a few times . . . mostly towards the end [of their relationship] . . . ."  Such accusations made only "a handful of times" over a short period of time do not amount to habitual cruel and inhuman treatment.  *Id.*

### D. Abandonment

¶24.   Karrah also asserts that Richard abandoned her on multiple occasions.  But the record contradicts this assertion.

¶25.   Karrah first claims that Richard "dropped her off at work, stranded her[,] and did not come back for her ([her] mother had to pick her up)."  Yet Karrah's testimony shows that when she got off work, she called Richard, who was at Cross Fit.  As a result, Karrah called her mother to pick her up.  There was no indication that Richard refused to pick her up or intentionally "stranded her" at work.

¶26.   Karrah further claims that Richard "locked her out of the apartment and left her stranded outside."  But the testimony shows that Karrah told Richard that her mother was picking her up to go to a basketball game and then she went outside to wait on her mother to arrive.  While Karrah was standing outside waiting on her mother, Richard left the apartment to go somewhere, locked the apartment as he left, and took the car.  Thus, Karrah's

testimony that Richard left her "stranded" with "no key to the house, no car to drive away in" is misleading.

¶27.    Karrah next claims that Richard "stranded her at McDonald's while pregnant." But the record shows that during an argument with Richard, while in the McDonald's drive-through, Karrah voluntarily got out of the car and went inside because she was "upset" and "couldn't take it anymore." Once inside, Karrah ordered a biscuit, sat down, and ate the biscuit. Karrah acknowledged that while in McDonald's, Richard tried to call her, but she did not answer and did not call him back. Instead, Karrah just waited, hoping Richard would "get over it so [they] didn't have to keep arguing . . . ." When she left McDonald's, Karrah did not call Richard but, instead, walked to the University of Southern Mississippi's college campus, walked on the track, and talked to one of her friends. Karrah eventually answered Richard's phone call, about forty-five minutes later. Richard then picked Karrah up.

¶28.    Additionally, Karrah claims that Richard "locked her out in the rain at Cross Fit." But on cross-examination, Karrah acknowledged that when she and Richard arrived at Cross Fit, Richard went inside to sign up for something and she waited outside. She explained that she was pregnant and the loud noises made the baby move around a lot, which caused her pain. As a result, Karrah did not go inside Cross Fit but, instead, walked across the street to a restaurant and ordered some lunch. Karrah did not tell Richard what she was doing or where she was going. Karrah testified that when Richard called her between twenty and thirty minutes later, she told him where she was and that her mother was on the way to pick her up.

¶29.    Karrah last claims that Richard abandoned her by "put[ting] her out of the car on the

11

spillway in the dark." Yet the record shows that Karrah voluntarily got out of the car. During an argument on the way to her parents' house, Karrah asked Richard to let her out of the car. The record shows that despite being a minute or less from her parents' house, Karrah demanded that Richard stop and let her out of the car.

### E. Physical Allegations

¶30. Karrah last asserts that Richard was "physical with her during the marriage."[4] Specifically, Karrah asserts that Richard pinched her and slapped her arm and leg. But Karrah acknowledged that she failed to include the pinching and slapping incidents in her discovery responses. Nevertheless, Karrah testified that these incidents occurred one time, on the same day, in August 2017, during what Karrah describes as a seventeen-hour argument.

¶31. Karrah further asserts that Richard would physically pick her up and "force her into the bedroom" to sleep. Karrah testified that Richard liked for them to go to bed at the same time because he had a hard time sleeping without her. Karrah explained that "if [she] was sitting on the couch and [Richard] wanted [her] to go get in the bed to go to sleep, he would try to . . . pick [her] up and take [her] in there." Karrah initially testified that this occurred "a few times." But when her attorney asked how often this behavior occurred on a monthly basis, Karrah responded that it occurred every "four to six weeks *maybe*." (Emphasis added.)

¶32. Karrah also testified that Richard would "move [her] out of his way." She explained

---

[4] Karrah does not allege physical abuse or that Richard "attempted to cause, or purposely, knowingly[,] or recklessly caused bodily injury to [her], or that [he] attempted by physical menace to put [her] in fear of imminent serious bodily harm." Miss. Code Ann. § 93-5-1.

that

> if [they] were in the hall way and . . . if [they] were going to run into each other . . ., [Richard] would kind of scoot to one side; [she] would scoot to one side, and he would push [her] to the other side and want to go where [she] had gone instead of going around [her].

Karrah denied that this was Richard's way of being playful. According to Karrah, this behavior started in February 2017, but progressively got worse. Karrah stated that by the end of their relationship, it occurred "*probably* weekly." (Emphasis added.)

¶33. On cross-examination, Karrah testified that "[e]verything [between her and Richard] really got worse in August [2017]." Yet the record shows that Karrah accompanied Richard to North Carolina on three separate occasions between August and December 2017 to visit the church where Richard had interviewed and ultimately accepted a position as a pastor. Moreover, the record shows that Karrah intended to move with Richard to North Carolina. Karrah resigned from her nursing position at the hospital and accepted a job in North Carolina. Karrah and Richard looked at houses in North Carolina, and Richard signed a lease on a house that they picked out together.

¶34. Thus, despite Karrah's allegations of spousal domestic abuse, she clearly planned to move with Richard to North Carolina. In fact, it was not until December 26, 2017, the day they were packing up their apartment to move, that Karrah decided not to go. Karrah testified regarding her decision to leave Richard as follows:

> [W]henever we were packing, he was, you know, constantly following me around, smothering me - because he did that all the time - daily almost - smother me. Touching me. Getting in my personal space.
>
> I couldn't go in one room or the next. I couldn't go outside. He would follow

13

me around trying to control me and watch every little move I was making, and he was doing that. And he was almost - he was either very firm or almost yelling at me about talking to my mom and my mom coming over, and he was trying to make me go run errands with him.

I said, "We don't have time. I just need a break from you right now. You know, you run errands; I'll do this."

He wouldn't take any of it, and he was so . . . ugly to me. And I was holding [Elizabeth], and that's the moment when I remember feeling like, you know, if I left right now, I would have peace. And I didn't leave right that moment; I waited but I knew in that moment, like, I wouldn't have a guilty conscious [sic] for leaving at that time.

¶35. Karrah did not tell Richard that she was leaving him. Instead, she took Elizabeth and left with her mother. Richard did not see Elizabeth again until March 2018.

¶36. Additionally, despite Karrah's testimony, the record shows that she posted various messages on social media expressing her love and admiration for Richard both before and during their fifteen-month marriage. Those social media posts include,

I love this man so much. He is gentle and kind, even when I'm a little crazy. He's the calm one with the sweetest heart and never gives up. I get to be his wife soon. [Posted August 20, 2016, approximately one month before Karrah and Richard were married]

Happy Father's Day to the best dad I could ever have and the best husband I could have for my baby. I love these two more and more every day. [Posted June 18, 2017, after the allegations of abandonment, and six months before Karrah left Richard]

So grateful for this lunch date today. Thanks, Hubs. [Posted August 7, 2017, just four months before Karrah left Richard]

¶37. The opinion concurring in part and dissenting in part suggests that this case is comparable to *Johnson v. Johnson*, 281 So. 3d 70 (Miss. Ct. App. 2019). We respectfully disagree and find it distinguishable. In *Johnson*, the husband did not appear at trial and,

14

therefore, did not testify. *Id.* at 72. The trial testimony showed that the husband became angry and accused his wife of infidelity "over and over" again, he threatened to kill her and burn down their house, he broke a lot of furniture in the house and threatened to pull a cabinet down on his wife, and he cursed her. *Id.* at 72-73. Moreover, in *Johnson*, the testimony showed that the husband physically abused his wife on multiple occasions. *Id.*

¶38. Here, the chancellor concluded that Karrah failed to present adequate proof of habitual cruel and inhuman treatment. This Court agrees. Karrah's evidence of habitual cruel and inhuman treatment, specifically, spousal domestic abuse, is nothing more than unkindness, rudeness, incompatibility, and/or want of affection. Miss. Code Ann. § 93-5-1. There was conflicting testimony regarding various allegations against Richard. Such testimony was considered by the chancellor. "This Court gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses' testimony and the parties' behavior." *Hoffman v. Hoffman*, 270 So. 3d 1121, 1127 (Miss. Ct. App. 2018) (internal quotation marks omitted) (quoting *McNeese v. McNeese*, 119 So. 3d 264, 275 (Miss. 2013)).[5]

¶39. Although Karrah alleges that Richard was critical and controlling, "[c]riticism and

---

[5] The opinion concurring in part and dissenting in part suggests that the chancellor should have conducted a subjective inquiry regarding Karrah's feelings. But the record shows that the chancellor considered the testimony, pleadings, and exhibits admitted at trial. Simply because the chancellor dismissed Karrah's complaint for divorce does not mean he did not consider Karrah's feelings. The opinion concurring in part and dissenting in part further states that "the majority does not consider how Richard Wangler's conduct made Karrah Wangler feel." CIPDIP Op. ¶ 47. But this Court considered the record and transcript, which include and discuss Karrah's testimony and feelings regarding Richard's alleged conduct.

controlling behavior [do] 'not fulfill the requirements of a divorce on the grounds of habitual cruel and inhuman treatment.'" *Osborne*, 202 So. 3d at 641 (quoting *Morris v. Morris*, 804 So. 2d 1025, 1032 (Miss. 2002)). While odd and even disrespectful at times, Richard's behavior does not amount to cruel and inhuman treatment. Indeed, Karrah's and Richard's immaturity, their lack of communication, their frivolous quarreling, their incompatibility, and their inability to manage conflict do not amount to cruel and inhuman treatment.

¶40. "A marriage may become unpleasant and argumentative, but not rise to the level of being so unnatural and infamous as to warrant the grant of divorce on the ground of habitual cruel and inhuman treatment." *Osborne*, 202 So. 3d at 642 (citing *Killen v. Killen*, 54 So. 3d 869, 873 (Miss. Ct. App. 2010)). While Karrah and Richard may have an unhappy, incompatible marriage, Karrah has failed to prove that Richard's behavior rises to the level of habitual cruel and inhuman treatment. Accordingly, the chancellor's judgment is affirmed.

## CONCLUSION

¶41. We find no error and affirm.

¶42. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶43. I concur in part and dissent in part. I agree with the majority that the chancellor did not err by denying Karrah Wangler's motion to amend her complaint. But I respectfully disagree with the majority that Richard Wangler's behavior did not rise to the level of

16

habitual cruel and inhuman treatment. The majority trivializes the husband's bad conduct, describing it as odd and disrespectful; but I see it as a pattern of behavior that "rises above the level of unkindness or rudeness or incompatibility or want of affection." Miss. Code Ann. § 93-5-1 (Rev. 2018) Therefore, I would hold that the chancellor erred by granting the motion to dismiss, and I would reverse and remand the case for further proceedings.

¶44.     In its 2017 amendment to the seventh ground for divorce found in Mississippi Code Section 93-5-1, the legislature relaxed the strict burden previously required for the granting of a divorce based on the ground of habitual cruel and inhuman treatment by permitting the granting of a divorce on this ground based on "spousal domestic abuse." The legislature employed language that would allow for any pattern of behavior that rises above unkindness or rudeness or incompatibility or want of affection to be sufficient to establish habitual cruel and inhuman treatment. Thus, it now is less difficult, by design, for Mississippians to extricate themselves, with the aid of their courts, from bad marriages. The amendment states explicitly that the type of spousal misconduct that can constitute grounds for divorce is not limited to that which is listed and requires only that the pattern of behavior rise above a level of unkindness or rudeness or incompatibility or want of affection. The longstanding statutory divorce ground of habitual cruel and inhuman treatment no longer is a remedy that applies only to outrageous and horrible physical abuse. It has been expanded exponentially to apply in cases in which any pattern of behavior that rises above the level of unkindness or rudeness or incompatibility or want of affection is proved by a preponderance of the evidence, even if such behavior merely is odd and/or disrespectful. As long as the pattern of behavior

17

surpasses the specified level, it fits into the expanded statutory definition of habitual cruel and inhuman treatment and satisfies that ground for divorce.

¶45.    The majority errs by relying on case law that was written before the 2017 amendment to Section 93-5-1. For example, *Osborne v. Osborne*, 202 So. 3d 639 (Miss. Ct. App. 2016), was decided on June 28, 2016, almost a year before the amendment went into effect. Yet the majority cites it for authority that criticism and controlling behavior do not amount to habitual cruel and inhuman treatment. *See Osborne*, 202 So. 3d at 641 ("Criticism and controlling behavior will 'not fulfill requirements of a divorce on the grounds of habitual cruel and inhuman treatment.'" (quoting *Morris v. Morris*, 804 So. 2d 1025, 1032 (Miss. 2002))). That aspect of *Osborne* now must yield to the 2017 enactment. The majority also cites with approval the following *Osborne* language: "A marriage may become unpleasant and argumentative, but not rise to the level of being so unnatural and infamous as to warrant the grant of divorce on the ground of habitual cruel and inhuman treatment." *Id.* at 642 (citing *Killen v. Killen*, 54 So. 3d 869, 873 (Miss. Ct. App. 2010)). Cases decided before the amendment, such as *Osborne*, have held that certain behaviors do not fulfill the requirements or rise to the appropriate level to warrant the granting of a divorce on the ground of habitual cruel and inhuman treatment. But the statutory amendment mandates that patterns of repetitive, bad spousal behavior now be recognized by our state's judiciary as habitual cruel and inhuman treatment.

¶46.    While the majority explains that it segmented the husband's offensive behavior into various categories for clarity purposes, it fails, erroneously, to consider those categories as

18

a whole in its assessment of whether there is a pattern of abuse. "There are many kinds of acts such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty." *Smith v. Smith*, 90 So. 3d 1259, 1263 (Miss. Ct. App. 2011) (internal quotation marks omitted) (quoting *Jackson v. Jackson*, 922 So. 2d 53, 57 (Miss. Ct. App. 2006)). This concept is embodied in the amended seventh ground for divorce. Karrah Wangler testified to the following abusive conduct by her husband:

1. He would take her cell phone and car keys away from her;

2. On one occasion, he turned off the internet as a means of trapping her in the house with him;

3. He falsely accused her of being unfaithful;

4. After she told him that he could not drive her to an event and she was going to have her mother pick her up, he decided to take his wife's keys, lock the door, and leave her stranded outside;

5. Against her will, he would pick her up and force her into the bedroom to sleep;

6. He would shove her aside in the hallway or anywhere else if he decided she was in his way;

7. On a regular basis, he would criticize her for hours; and

8. He discouraged her from interacting with others and, if she did so, he criticized her for as many as three days.

All of these accusations are components that comprise Richard Wangler's whole behavioral pattern. When the conduct of the husband is considered as a whole, a clear pattern of spousal misbehavior amounting to habitual cruel and inhuman treatment under the statute emerges.

19

Richard Wangler was critical, physically abusive, and controlling throughout the entirety of the marriage. His behavior was more than unkindness or rudeness; he exhibited downright cruel behavior toward his wife.

¶47. This Court has held that, when considering a divorce based on habitual cruel and inhuman treatment, "[t]here is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse." *Bodne v. King*, 835 So. 2d 52, 59 (Miss. 2003) (citing *Fisher v. Fisher*, 771 So. 2d 364, 368 (Miss. 2000)); *see also Smith*, 90 So. 3d at 1263. "Evaluating the impact on the offended spouse is a subjective inquiry. The focus is on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person." *Smith*, 90 So. 3d at 1263 (citing *Faries v. Faries*, 607 So. 2d 1204, 1209 (Miss. 1992)); *see also Bodne*, 835 So. 2d at 59 ("The effect of the conduct on the offended spouse is determined by a subjective standard, which is to say that an attempt is made to weigh the likely effects of the conduct on the offended spouse, as opposed to a normative standard." (citing *Morris v. Morris*, 783 So. 2d 681, 688 (Miss. 2001))); *Morris*, 783 So. 2d at 688 ("This Court has further held that the impact on the plaintiff caused by the other spouse is crucial; thus, we employ a subjective standard." (citing *Faries*, 607 So. 2d at 1209)). Here, the majority does not consider how Richard Wangler's conduct made Karrah Wangler feel. After reviewing her testimony, it is apparent that her husband's pattern of relentless criticism and bad behavior led her to feel sleep deprived, isolated, and unsafe. While she did acknowledge that she already was losing sleep due to the baby, she testified also that she would be criticized regularly for hours, even after asking her husband to stop.

20

Karrah Wangler was asked at trial whether she felt isolated and she responded with a resounding, "Very isolated." She testified also that when her husband was being physical with her, he did so in a "very intimidating" way. Her decision to separate was based on her fear for her safety due to her husband's pattern of behavior and his unwillingness to change.

¶48. The majority finds no indication that Richard Wangler intentionally abandoned Karrah Wangler. I disagree. Such a determination is supposed to be based upon a subjective inquiry. The majority focuses more on whether Richard Wangler intentionally abandoned his wife than on the question of whether his conduct made her feel as if she had been abandoned. The majority's approach creates a double standard by dissecting Karrah Wangler's voluntary acts while overlooking her husband's abandoning and stranding of his wife on multiple occasions. During each incident of abandonment, Karrah Wangler left the vehicle because of her husband's obnoxious behavior. On each occasion, he either was frightening or upsetting her to the point that she could not take it any more. The majority labels her reactions to his conduct as voluntary. In truth they were the efforts of a desperate woman doing her best to get away from an abusive husband.

¶49. Before the amendment to Section 93-5-1, this Court repeatedly declined to find habitual cruel and inhuman treatment on the basis of "petty indignities, frivolous quarrels, general incompatibility or petulant tempers" and required conduct that is "more than mere unkindness or rudeness, or incompatibility." *Talbert v. Talbert*, 759 So. 2d 1105, 1108 (Miss. 1999) (quoting *Potts v. Potts*, 700 So. 2d 321, 323 (Miss. 1997)); *see also Reed v. Reed*, 839 So. 2d 565, 570 (Miss. Ct. App. 2003) ("The conduct may be in the form of emotional abuse;

21

however, it must be more than mere 'unkindness, rudeness, or incompatibility.'" (quoting *Brooks v. Brooks*, 652 So. 2d 1113, 1124 (Miss. 1995))). But after the amendment became law, the Mississippi Court of Appeals upheld a chancellor's grant of a divorce on the ground of habitual cruel and inhuman treatment in a situation with limited physical violence in which the wife's testimony demonstrated a pattern of emotional abuse that surpassed mere unkindness or rudeness. *Johnson v. Johnson*, 281 So. 3d 70, 75 (Miss. Ct. App. 2019) ("Although Nikki testified to only two specific instances of physical abuse by Daniel, her and Brett's testimonies demonstrated a pattern of abuse that enabled the chancellor to grant a divorce on the grounds of habitual cruel and inhuman treatment."). This case is comparable. Richard Wangler's conduct is similar to the husband's conduct in *Johnson*. In each case, both husbands repeatedly abused their wives verbally and made the wives feel that they could not talk to others for fear of suffering their husbands' wrath. *Id.* at 72-73. In both cases there was increasing bad behavior by the husbands throughout the marriages. *Id.* While it is true that, unlike the husband in *Johnson*, Richard Wangler testified at trial, his testimony did not address any of the allegations of abuse. In *Johnson*, the chancery court correctly based its decision on a subjective inquiry and did not focus on the lack of overwhelming physical violence. *Johnson*, 281 So. 3d at 75 ("Although Nikki testified to only two specific instances of physical abuse by Daniel, her and Brett's testimonies demonstrated a pattern of abuse that enabled the chancellor to grant a divorce on the grounds of habitual cruel and inhuman treatment."). Rather, the chancellor focused on the offended spouse's testimony, which demonstrated that the wife felt "very afraid, unsafe, and scared" and ultimately sought

a divorce because of her fear of her husband. *Id.* at 73. It was on the basis of subjective testimony that the chancellor granted the divorce on the ground of habitual cruel and inhuman treatment. *Id.* at 75.

¶50. In this case, had the chancellor focused on the wife's subjective testimony as was done in ***Johnson***, he likely would have found that Richard Wangler's pattern of conduct made Karrah Wangler feel isolated and unsafe. The chancellor did have the advantage of observing the wife in person and this Court is working from a cold record. But the chancellor gave no indication that he disbelieved Karrah Wangler or that he failed to find her credible. Rather, he simply did not recognize that the spousal malevolence she described was statutorily sufficient to establish this ground for divorce. It is with that assessment that I respectfully disagree.

¶51. The majority seems to suggest that since Karrah Wangler was representing to the world that she was in a loving marriage, as suggested by her Facebook posts, her allegations cannot be validated. I disagree. The majority fails to consider her testimony in explanation of those posts. It appears that the chancellor relied on the Facebook posts when making his determination as well. The record contains thirteen social media posts from Karrah Wangler's Facebook account that discuss Richard and Karrah's relationship.[6] Of the thirteen, eight were before the marriage and five were during the marriage. The eight social media posts from before the marriage should not be considered because they occurred before the

---

[6]A total of fifteen social media posts are in the record. Two of these posts are photographs of Karrah and Richard Wangler's daughter. These two posts are not relevant to Richard Wangler's conduct toward Karrah Wangler.

23

marriage.

¶52.   The five posts that occurred during the marriage are as follows:

1.    a post by Karrah Wangler that Richard Wangler had prepared her breakfast at the beginning of their marriage;

2.    a picture of the couple at a University of Alabama football game;

3.    an updated profile picture of the couple;

4.    a Father's Day post with a picture of Karrah Wangler's father and a picture of Richard Wangler; and

5.    a post by Karrah Wangler thanking Richard Wangler for a lunch date that included their daughter.

Karrah Wangler's testimony explained the Facebook posts. She testified that her husband had not prepared her breakfast since the social media post and that the Father's Day post was meant as a way to encourage her husband. As for the lunch date post, her testimony implies that her husband did so only because their daughter would not stop crying. When considering Karrah Wangler's explanation of the social media posts, it becomes clear that Karrah Wangler's posts are not a true expression of her "love and admiration" for her husband. Therefore, the social media posts should not have been a deciding factor in this case.

¶53.   The majority did not find that Richard Wangler's behavior was habitual. Karrah Wangler and Richard Wangler were married a mere fifteen months before they separated. Throughout those fifteen months, Richard Wangler continuously and routinely was hateful and cruel to his wife. Karrah Wangler testified that his cruel behavior had increased throughout the last four months of the marriage. Her testimony established that her husband's conduct sometimes would occur hourly and sometimes weekly. It is clear from Karrah

24

Wangler's largely unrefuted testimony that Richard Wangler's abusive conduct was habitual.

¶54. The 2017 amendment to Section 93-5-1 leaves no room to doubt that the legislature intended to make obtaining a divorce on the ground of habitual cruel and inhuman treatment easier than previously was possible in Mississippi. Richard Wangler demonstrated a pattern of bad behavior that amounted to habitual cruel and inhuman treatment under Section 93-5-1. I find that the chancellor erred by granting Richard Wangler's motion to dismiss, and I would reverse and remand.

**KING, P.J., JOINS THIS OPINION.**