# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CA-00609-SCT

*INDIA GAMBRELL KERR*

*v.*

*WILLIAM JACK (BJ) KERR*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2019 |
| TRIAL JUDGE: | HON. FRANKLIN C. McKENZIE, JR. |
| TRIAL COURT ATTORNEYS: | DANIEL KYLE ROBERTSON |
| | KRISTIN MICHELLE McGEE |
| | CAROL ANN ESTES BUSTIN |
| | WILLIAM CHARLES BELL |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM CHARLES BELL |
| | JOHN SAMUEL GRANT, IV |
| ATTORNEY FOR APPELLEE: | CAROL ANN ESTES BUSTIN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 04/15/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., CHAMBERLIN AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.     This is an appeal from the chancery court's grant of divorce to BJ Kerr on the ground of habitual cruel and inhuman treatment and its award of joint custody of the minor child, WHK.[1]   India Kerr, BJ's ex-wife, argues that the chancellor erred by granting her ex-husband's petition for divorce and not her own.  She further seeks an amendment to the

---

[1] We use the minor's initials in place of his name.

custody award arguing that the chancellor's *Albright*[2] analysis was incorrect. This Court finds that the chancellor did not err by granting BJ's divorce complaint and by awarding joint custody.

**FACTS**

¶2. BJ and India were married on August 21, 2015, and resided together in Laurel, Mississippi. Around one year before their marriage, the parties had a child together, WHK. On September 6, 2016, BJ filed a "complaint for divorce and temporary relief and complaint for emergency and temporary custody and for permanent custody" of WHK. In his complaint, BJ alleged that India was unfit to provide care or custody of WHK for several reasons, namely:

> [India] has neglected and endangered the minor child by her actions including but not limited to: failing to properly undergo treatment for mental illness after her involuntary commitment of August 12, 2016; physically assaulting [BJ] in front of the minor child and even with the minor child in her arms; physically assaulting her own father in the presence of the minor child on August 12, 2016; leaving home with the minor child without any means of providing for the minor child; purposefully driving and wrecking her vehicle into another out of rage and while the minor child was a passenger; threatening to kill herself; and allowing the minor child to be around someone with criminal behavior.

¶3. BJ also contended that India was unfit to care for WHK because she was involuntarily committed and hospitalized due to mental illness. BJ sought a divorce from India on the grounds of habitual cruel and inhuman treatment, or alternatively, irreconcilable differences. He additionally requested an emergency hearing regarding custody of WHK as well as a

---

[2] *See* **Albright v. Albright**, 437 So. 2d 1003 (Miss. 1983).

temporary restraining order against India.  The chancellor granted BJ an ex parte order for emergency custody of WHK on September 7, 2016.

¶4.    India then filed a motion to dissolve the chancellor's order awarding temporary custody of WHK to BJ.  India filed a countercomplaint for divorce and her own motion for temporary relief.  In India's complaint, she contended that BJ was guilty of adultery and habitual cruel and inhuman treatment.  In the alternative, India pled irreconcilable differences.  She additionally requested legal and physical custody of WHK, child support from BJ, alimony from BJ, attorneys' fees, and she further requested that BJ pay her and WHK's hospitalization and medical insurance.

¶5.    The chancellor found that India's motion to dissolve the ex parte order for emergency child custody was not well-taken but that certain relief should be granted. First, the chancellor held that BJ should continue to exercise temporary legal and physical care and custody of WHK.  Second, India would be entitled to supervised visitation on alternating weekends.  The exchange of WHK was ordered by the chancellor to take place at the Laurel Police Department.

¶6.    India then filed an amended motion to dissolve the ex parte order awarding temporary custody to BJ.  After another hearing, the chancery court ordered that the parties exercise temporary joint legal and physical and custody of WHK, with the parties exercising alternating weeks of physical custody and exchanging WHK at noon each Monday at Trinity Early Learning Center.  The court also found that WHK would remain enrolled at Trinity

3

Early Learning Center and ordered that he be present at the preschool for half the day. The court additionally ordered that BJ keep the marital residence.

¶7. BJ contended that upon picking up WHK from India to begin his week of custody on January 16, 2016, he noticed that WHK was acting abnormally. BJ then took WHK for a medical examination. WHK's blood-test results came back positive for benzodiazepines, which according to BJ, WHK was not prescribed. BJ also contended that India had failed to take WHK to the Trinity Learning Center for one half of each day, thus violating the chancery court's custody order. BJ filed a motion to modify the custody order, to appoint a guardian ad litem, and for contempt in light of his allegations that India negligently allowed WHK to get the drugs and did not meet the standards set forth in the temporary-custody order.

¶8. Following a hearing, the court found that BJ's motion for modification of temporary custody should be granted. The court gave BJ primary custody and India visitation on alternating weekends. In response, India filed another motion for appointment of a guardian ad litem (GAL), which the court granted.

¶9. India also filed a motion to amend her countercomplaint for divorce to include an allegation that BJ had abused her during the marriage. Specifically, the amended countercomplaint alleged that "BJ Kerr's history of family violence create a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be

4

placed in the physical and/or legal custody of BJ Kerr."[3]  She alleged that there was no evidence to rebut the presumption. India included photographs of redness and scratches on her body.  She additionally included an affidavit from Officer Michael Reeves of the Laurel Police Department charging BJ with aggravated domestic assault.  The chancery court granted India's motion to amend her pleadings.  India then filed a motion for partial summary judgment on the question of the domestic-violence-custody presumption, arguing that because BJ had a history of perpetrating family violence, the court should find that the custody presumption under Section 93-5-24(9)(a)(i) was the law of the case.

¶10.    But India later dropped the charge against BJ, and on August 25, 2016, the municipal court issued an order of expunging BJ's domestic-violence charge.  BJ responded to India's motion for partial summary judgment and denied any allegations of abuse.  In his response, BJ included the expungement order and a municipal court order denying India's petition for a protective order because her allegations of abuse were unfounded.

¶11.    The chancellor found that there existed numerous issues of material fact and thus denied India's motion for partial summary judgment.  "In particular," the chancellor held, "one of the most hotly contested issues in the case is whether or not BJ Kerr committed any act(s) of domestic violence against India Kerr."

---

[3] India cited Mississippi Code Section 93-5-24(9)(a)(i) (Rev. 2018) which states in part that "[i]n every proceeding where the custody of a child is in dispute, there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence."

¶12. The appointed GAL issued a report and recommendation regarding custody on June 5, 2018. After a detailed *Albright* analysis, she concluded that India and BJ should share joint physical and legal custody of WHK.

¶13. After hearing a trial on the merits, the court granted BJ a divorce for habitual cruel and inhuman treatment. As to custody of WHK, the chancellor disagreed with some of the GAL's *Albright* findings.[4] The chancellor found that "the GAL did not place enough emphasis on [WHK's] testing positive for Klonopin and did not place enough emphasis on [WHK]'s excessive absences from the court ordered pre-school while in India's custody." Ultimately, the chancellor held that the parties should share joint legal custody but that BJ would have physical custody.

¶14. The chancellor ordered that India pay monthly child support based on her ability to earn minimum wage. BJ was to pay 80 percent of the dental and medical expenses not covered by insurance, and India was to pay the rest. The chancellor performed an *Armstrong*[5] analysis and found that "[t]he short duration of the marriage, along with both parties having college degrees, mitigate[ed] against an award of alimony." The chancellor denied India's request for alimony.

¶15. Ownership of the marital home was given to BJ. Because the court found that India's allegations of domestic violence were not credible and granted the divorce to BJ, the court

---

[4] A detailed analysis of the chancellor's *Albright* findings can be found below in the discussion of Issue 5.

[5] *See Armstrong v. Armstrong*, 618 So. 2d 1278 (Miss. 1993).

denied India's request for attorneys' fees. India appealed the final judgment on April 3, 2019.

## ISSUES

¶16.    India raises five issues on appeal:[6]

>    (1) Whether the chancellor erred by admitting WHK's medical record into evidence.
>
>    (2) Whether India proved divorce grounds based on habitual cruel and inhuman treatment.
>
>    (3) Whether the chancellor erred by denying India's Mississippi Rule of Civil Procedure 41 motion to dismiss.
>
>    (4) Whether the chancellor should have applied the domestic-violence-custody presumption against BJ.
>
>    (5) Whether the chancellor's *Albright* analysis was flawed.

## STANDARD OF REVIEW

¶17.    "The standard of review employed by this Court for review of a chancellor's decision is abuse of discretion." *Alexis v. Black*, 283 So. 3d 1105, 1107 (Miss. 2019) (internal quotation marks omitted) (quoting *McNeil v. Hester*, 753 So. 2d 1057, 1063 (Miss. 2000)). "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous[,] or an erroneous legal standard was applied." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 880 (Miss.

---

[6] The order of the issues presented was changed for clarity.

7

1999)). "The standard of review in child custody cases is limited. Reversal occurs only if a chancellor is manifestly wrong or applied an erroneous legal standard." *Barber v. Barber*, 288 So. 3d 325, 330 (Miss. 2020) (internal quotation marks omitted) (quoting *Floyd v. Floyd*, 949 So. 2d 26, 28 (Miss. 2007)).

## DISCUSSION

**1. Whether the chancellor erred by admitting WHK's medical record into evidence**.

¶18. BJ offered into evidence WHK's medical records from South Central Regional Medical Center in Laurel. These records indicated that immediately after India's weekend custody of WHK and after BJ had WHK drug tested, WHK tested positive for benzodiazepines. In making the custody determination, the chancellor ordered that WHK's medical records, including the results from a drug test, be admitted into evidence. India argues that this record was erroneously admitted into evidence because it was inadmissable hearsay and not properly authenticated.

¶19. "[This Court's] standard of review for the admission of or refusal to admit evidence is well settled." *Bower v. Bower*, 758 So. 2d 405, 413 (Miss. 2000). "[A]dmission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Id.* (internal quotation marks omitted) (quoting *K-Mart Corp. v. Hardy*, 735 So. 2d 975, 983 (Miss. 1999)). We conclude that the chancellor did not abuse his discretion by admitting the medical records because they were excepted from the rule against hearsay and were properly authenticated by way of certification.

8

¶20.    Mississippi Rule of Evidence 801(c)(1) and (2) defines hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement." In order to be admissible, evidence must also be properly authenticated. MRE 901. Rule 901(a) mandates that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 803 provides that certain types of statements will not be excluded by the rule against hearsay. Rule 803(6) states:

> A record of an act, event, condition, opinion, or diagnosis [qualifies as an exception] if:
>
> **(A)** the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> **(C)** making the record was a regular practice of that activity;
>
> **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11); and
>
> **(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

MRE 803(6). WHK's medical records qualified as an exception to the rule against hearsay.

¶21.    WHK's medical records were admitted along with an affidavit from Amanda Hicks, clinic manager at South Central Clinics. As authorized custodian of the medical records at South Central Clinics, Hicks certified that the medical records were, indeed, a "true and

9

correct copy." WHK's medical records state, "[d]rug screen results positive for clonazepam/benzodiapines." At trial, when India's counsel objected to the medical record as not properly authenticated, the chancellor pointed to the certification and overruled the objection. We agree with the chancellor that the medical record was authenticated under Mississippi Rule of Evidence 902(11)[7] and, as such, the chancellor did not abuse his discretion by admitting WHK's medical records into evidence.

### 2. Whether India proved divorce grounds based on habitual cruel and inhuman treatment.

¶22. India argues that the chancellor erroneously failed to award her a divorce based on cruel and inhuman treatment, namely, her allegations of BJ's domestic violence against her. After holding a trial and hearing from several witnesses, the chancellor found that India's claims of domestic abuse were "simply not credible." This Court now examines whether the chancellor's final judgment of divorce was erroneous.

¶23. "This Court will not reverse a chancery court's findings of fact where they are supported by substantial credible evidence in the record." **Rogers v. Morin**, 791 So. 2d 815, 820 (Miss. 2001) (citing **Anderson v. Burt**, 507 So. 2d 32, 36 (Miss. 1987)). "The chancellor, by his presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be

---

[7] Rule 902(11) provides that certified records of a regularly conducted activity that meet the requirements of Rule 803(6) are self-authenticating if there is an accompanying certificate of the custodian or another qualified witness.

10

ascribed to the evidence given by those witnesses." *Id.* at 826 (internal quotation marks omitted) (quoting *Carter v. Carter*, 735 So. 2d 1109, 1114 (Miss. Ct. App. 1999)). "This Court is 'required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong.'" *Id.* (quoting *Newsom v. Newsom*, 557 So. 2d 511, 514 (Miss. 1990)).

¶24. In the final judgment of divorce, the chancellor extensively outlined why India did not prove habitual cruel and inhuman treatment. He noted that "[India's] father had her committed the day after she went to the [Laurel Police Department] and had BJ charged with felony domestic assault." The chancellor also stated that "[a]dditional checked boxes on the [commitment] intake questionnaire include[ed] that she has a history of present danger to others, attempts to harm others, and has harmed others." The chancellor reasoned "that the intake questionnaire filled out by India's father was truthful and honest because at that time he was seeking help for his mentally ill daughter, and it adds credence to BJ's testimony and position that she fabricated the entire domestic abuse claim against him, that she hit BJ's vehicle, and that in fact, she is the one who lies, hits, scratches and bites her family." None of the witnesses during trial testified that they ever observed BJ acting violently towards India, yet multiple witnesses, including India's father, testified that they had witnessed India being violent. The chancellor further included the findings of a municipal court judge in denying India's petition for a domestic-abuse protective order:

> [The municipal court judge's] order specifically found that, "the Court having considered the evidence in this cause finds that Petitioner's allegations of

abuse are without merit and that Petitioner is not a victim of abuse." This Court agrees with Judge Robertson that no domestic violence was committed by BJ against India at the family meeting. This Court also finds that no domestic abuse was committed by BJ against India on August 11, 2016, or at any other time that she alleged.

¶25. Because India failed to present credible evidence of habitual cruel and inhuman treatment, the chancellor committed no error by denying India a divorce on these grounds.

### 3. Whether the chancellor should have granted India's motion to dismiss.

¶26. BJ filed for divorce from India on the grounds of habitual cruel and inhuman treatment. After BJ rested, India moved to dismiss BJ's divorce complaint under Mississippi Rule of Civil Procedure 41(b), which the chancellor denied. The chancellor subsequently granted BJ's petition for divorce. India argues that BJ failed to prove habitual cruel and inhuman treatment as grounds for divorce and, thus, the chancellor erred by denying India's motion to dismiss.

¶27. Mississippi Rule of Civil Procedure 41(b) states, in pertinent part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court may then render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

¶28. "This Court applies the substantial evidence/manifest error standards to an appeal of a grant or denial of a motion to dismiss pursuant to [Rule] 41(b)." *Wangler v. Wangler*, 294 So. 3d 1138, 1142 (Miss. 2020) (internal quotation marks omitted) (quoting *Stewart v.*

12

***Merchs. Nat'l Bank***, 700 So. 2d 255, 259 (Miss. 1997)).  Legal questions are  reviewed de

novo on appeal.  ***Id.*** (quoting ***Pittman v. Pittman***, 195 So. 3d 727, 732 (Miss. 2016)).

¶29.    Mississippi Code Section 93-5-1 (Rev. 2018) states, in part:

> Habitual cruel and inhuman treatment, including spousal domestic abuse.
>
> Spousal domestic abuse may be established through the reliable testimony of a single credible witness, who may be the injured party, and includes, but is not limited to:
>
> That the injured party's spouse attempted to cause, or purposely, knowingly or recklessly caused bodily injury to the injured party, or that the injured party's spouse attempted by physical menace to put the injured party in fear of imminent serious bodily harm; or
>
> That the injured party's spouse engaged in a pattern of behavior against the injured party of threats or intimidation, emotional or verbal abuse, forced isolation, sexual extortion or sexual abuse, or stalking or aggravated stalking as defined in Section 97-3-107, if the pattern of behavior rises above the level of unkindness or rudeness or incompatibility or want of affection.

Miss. Code Ann. § 93-5-1 (Rev. 2018).   A divorce on the ground of habitual cruel and

inhuman treatment requires that the following to be shown by a preponderance of the

evidence:

> [C]onduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

***Wangler***, 294 So. 3d at 1142-43 (alteration in original) (quoting ***Osborne v. Osborne***, 202

So. 3d 639, 641 (Miss. Ct.  App.  2016)). "[T]he offended spouse must show a causal

connection between the offending spouse's conduct and the impact on the offended spouse." *Id.* (internal quotation mark omitted) (citing *Baggett v. Baggett*, 246 So. 3d 887, 892 (Miss. Ct. App. 2017)). "Although in cases of violence a single incident may be sufficient for a divorce, generally the plaintiff must show a pattern of conduct." *Id.* (internal quotation marks omitted) (quoting *Baggett*, 246 So. 3d at 892). "Actions that would not in themselves support divorce may be sufficient in combination to qualify as habitual, cruel, and inhuman." Deborah H. Bell, *Bell on Mississippi Family Law* § 4.02[8] (2d ed. 2017).

¶30. "Conduct that includes habitual, false accusations, threats and malicious sarcasm, insults and verbal abuse may establish mental suffering such that the environment destroys the health and endangers the life of the non-offending spouse." *Cassell v. Cassell*, 970 So. 2d 267, 270 (Miss. Ct. App. 2007) (citing *Robison v. Robison*, 722 So. 2d 601, 603 (Miss. 1998)). The "impact of the conduct on the plaintiff suing for divorce under these grounds is crucial." *Holladay v. Holladay*, 776 So. 2d 662, 677 (Miss. 2000) (citing *Robison*, 722 So. 2d at 603).

¶31. At trial there were three witnesses who attested to observing India's violent nature. India's father, Steve Gambrell, sought to have India committed to Pinebelt Health Center the day after she accused BJ of domestic assault. In the intake form signed by him, Gambrell told Pinebelt, "I got attacked by India today. Her violent temper. Her lies to make everyone look bad. She doesn't appear to be mentally stable." Gambrell further testified that India scratched him, hit him, and screamed at him after he would not let India leave the house with

14

WHK. He stated that he did not want India driving while angry. When asked if WHK observed India's violence, he replied "probably so." BJ's attorney addressed Gambrell's assertion that India was lying to make everyone look bad:

Q. Okay. So she's trying to make people look bad?

A. I reckon.

Q. Okay. Would that people include her husband, BJ?

A. I reckon so.

¶32. India herself admitted that she pushed her father on the day that he had her committed to Pine Belt Mental Healthcare. Gambrell testified that while he was on the phone with 911, India was saying, "stop hitting me, stop tearing, grabbing my clothes." Gambrell stated that she was lying. The results of India's preevaluation screening for commitment at Pine Belt Mental Healthcare had checked boxes that India was a danger to herself, had high-risk behavior, and had a preoccupation with death. The intake also listed that India had a history of present danger to others, had attempted to harm others, and had harmed others.

¶33. Jackie Kerr, BJ's mother also testified to India's violent nature, specifically towards BJ. She answered affirmatively when asked whether she observed anything between BJ and India that concerned her, stating:

> I walked up to the backdoor one—one evening, and they weren't expecting me. I just went there, and the door was open and—but the screen door was shut, and I just walked up to the screen door and saw them standing in the kitchen, and India was hitting on BJ, just slapping him about and hitting on him. And then when I walked into the room—when I opened the door, they heard me, turned around and looked, and she went into the bedroom.

15

¶34. Jackie said she never observed BJ being aggressive towards India. In another instance, Jackie recounted a Sunday afternoon when BJ called her and told her, "India is having one of her meltdowns." Upon arriving to their house Jackie observed:

[India's] eyes were like saucers, and she kept doing her head up and down. And there were two cops there, and she kept on saying, I don't care. I don't care. I just want him arrested. I just want him to go to jail. One of the cops said, [y]ou do know that we take him to jail, he will lose his job and there will be no way to support you and the child? I don't care. I don't care, just take him to jail. I want him arrested. And at one point, both cops talked to her, got her calmed down. And at that point, she admitted they were just arguing, and they needed a mediator.

¶35. BJ's father, too, testified about witnessing India's violent actions toward BJ. He stated that he was once called to their house and observed: "India was screaming, hollering. She had BJ backed up against the—the kitchen counter. She had [WHK] in her left hand, and she was striking BJ with her right hand and just screaming and hollering and all." At trial, when questioned about India's allegation of domestic abuse against BJ that occurred in sometime around April of 2015, India herself admitted that she struck BJ.

¶36. While BJ did not seek out counseling or therapy as a result of India's treatment of him, he did testify that he was "incredibly embarrass[ed]." BJ stated that during India's "meltdown episode[s]," she would yell at him that nothing was good enough. "The house wasn't good enough, the car wasn't good enough, I wasn't, her clothes, her hair, I mean, anything under the sun." He testified that India's father and his own father witnessed India yelling at BJ.

¶37. BJ also testified how he had to have WHK drug tested immediately after India

16

returned the child to him. He stated that BJ and his father arrived at the police station to pick up WHK at the noon court-ordered time. According to BJ, India and her family did not arrive with WHK until an hour later. BJ recounted that "[b]efore I ever saw [WHK] get out of the car, I saw his face didn't look right, like his eyes were glazed over." After taking WHK to visit BJ's mother at the mother's work, he testified that his mother and her collegues said, "his eyes don't look right. Don't really know how to describe it but they did not look how you would expect a two-year old's eyes to look." BJ noted WHK's "equilibrium was off. He was wobbling. He couldn't walk a straight line. It was like a drunk two-year old." Believing WHK had been exposed to something, BJ got WHK drug tested. The drug screen results were positive for clonazepam/benzodiazipines (Klonopin).

¶38. India denied giving WHK Klonopin. Child Protective Services conducted an investigation and found that the allegations of physical neglect were unsubstantiated because when handed a pill bottle, WHK could not open it. But BJ testified that during their marriage "a few times I did find medicine laying, just an open pill laying around. I found it on the bed once. I found it on the carpet once in the bedroom. I found it on the bathroom counter, not in the pill box, not in a bottle." Additionally, India admitted that she had taken at least thirteen different medicines in the last four years that are sedatives or antidepressants, including Klonopin. India admitted that she tested positive for benzodiazepines, Klonopin in particular, when she was committed in 2016.

¶39. "It is common sense that abuse or mistreatment of a person's child may constitute

17

cruelty to that person." *Pittman*, 195 So. 3d at 734. This Court has held "that chancery courts may consider evidence of child abuse or mistreatment as conduct supporting the grant of a divorce based on habitual cruel and inhuman treatment." *Id.*

¶40. Three credible witnesses observed India's violent behavior in general and toward BJ. "While [this Court] require[s] a high standard for proving habitual cruelty and inhuman treatment, this Court does not require an impossible one." *Holladay*, 776 So. 2d at 677. This Court finds that the evidence was sufficient to support an award of divorce on the grounds of habitual cruel and inhuman treatment.

### 4. Whether the chancellor should have applied the domestic-violence-custody presumption against BJ.

¶41. Next, India claims that the chancellor incorrectly placed WHK in the physical custody of BJ. She reasons that "the chancellor failed to make the required findings under Mississippi Code § 93-5-24(9) about whether or not the domestic violence custody presumption was or was not triggered."

¶42. This Court "will affirm the [child-custody] decree if the record shows any ground upon which the decision may be justified. . . . [It] will not arbitrarily substitute [its] judgment for that of the chancellor who is in the best position to evaluate all factors relating to the best interest[ ] of the child." *Brumfield v. Brumfield*, 49 So. 3d 138, 142 (Miss. Ct. App. 2010) (first, second, and fifth alterations in original) (quoting *Mosley v. Mosley*, 784 So. 2d 901, 905-06 (Miss. 2001)).

¶43. Mississippi Code Section 93-5-24(9)(a)(i) states that where the custody of a child is

18

disputed:

> [T]here shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence. The court may find a history of perpetrating family violence if the court finds, by a preponderance of the evidence, one (1) incident of family violence that has resulted in serious bodily injury to, or a pattern of family violence against, the party making the allegation or a family household member of either party.

¶44. "This presumption may only be rebutted by a preponderance of the evidence." Miss. Code Ann. § 93-5-24(9)(a)(ii) (Rev. 2018). The statute requires the court to consider all of the following factors when determining whether the presumption has been overcome:

> 1. Whether the perpetrator of family violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child because of the other parent's absence, mental illness, substance abuse or such other circumstances which affect the best interest of the child or children;
>
> 2. Whether the perpetrator has successfully completed a batterer's treatment program;
>
> 3. Whether the perpetrator has successfully completed a program of alcohol or drug abuse counseling if the court determines that counseling is appropriate;
>
> 4. Whether the perpetrator has successfully completed a parenting class if the court determines the class to be appropriate;
>
> 5. If the perpetrator is on probation or parole, whether he or she is restrained by a protective order granted after a hearing, and whether he or she has complied with its terms and conditions; and
>
> 6. Whether the perpetrator of domestic violence has committed any further acts of domestic violence.

Miss. Code Ann. § 93-5-24(a)(iii) (Rev. 2018). The statute additionally requires that "[t]he

19

court shall make written findings to document how and why the presumption was or was not rebutted." Miss. Code Ann. § 93-5-24(a)(iv) (Rev. 2018).

¶45.    In ***Rolison v. Rolison***, 105 So. 3d 1136 (Miss. Ct. App. 2012), the Court of Appeals addressed the domestic-violence presumption and found that the chancellor properly refused to apply the presumption against either party.  The chancellor had found "that at times, [the ex-husband] was aggressive with the children and had a foul mouth." ***Id.***  But "[t]here [was] also evidence of [the ex-wife's] perpetrating family violence.  [She had] bipolar disorder, borderline personalty disorder, and ADHD.  She [took] medication and receiv[ed] treatment but . . . shoplifted at numerous stores and blamed her behavior on her medication." ***Id.*** at 1139.  Both parents admitted behaving aggressively with the children, but there was no evidence of serious injury committed by the ex-wife or ex-husband. ***Id.***

¶46.    The Court of Appeals agreed that [t]he record contain[ed] evidence of both parents' actions that could be construed as perpetrating family violence. ***Id.*** at 1138.  It found that the chancellor did not abuse his discretion by refusing to apply the statutory presumption against either party. ***Id.*** at 1139; *see also* ***Thompson v. Hutchinson***, 84 So. 3d 840, 844 (Miss. Ct. App. 2012).

¶47.    Here, the record reflects that India accused BJ of domestic assault on August 11, 2016.  India claimed that BJ physically assaulted her.  According to the officer that responded to India's complaint at the Laurel Police Department, India had "swelling, redness[,] and abrasions on her neck, shoulders[,] and collar bone area," leading him to

believe at the time that BJ "did willingly, lawfully, and feloniously cause serious bodily injury to India . . . ." BJ was arrested and charged with domestic violence. The charge against BJ was dropped pursuant to a letter from the Laurel Police Department indicating that India had dropped the charges.

¶48. On August 25, 2016, the Jones County Municipal Court ordered that BJ's charge be expunged since the charge was dropped. India then petitioned the municipal court for a domestic-abuse protective order. On September 2, 2016, the municipal court conducted a hearing regarding the domestic-abuse allegations. The municipal court found "that [India's] allegations of abuse [were] without merit and that [India] [was] not a victim of abuse as defined in [Mississippi Code Section] 93-21-3."

¶49. In India's motion for summary judgment, she put forth an additional allegation in her affidavit that in late April or early May 2016, when India and BJ lived in Stringer, Mississippi, BJ had abused India. India alleged that "BJ Kerr began slapping and hitting me around my head and face. BJ Kerr pushed me against the dresser, pushed me onto the bed, and was slapping and hitting me. I had my hands up in a defensive posture. I called 911. The Jasper County Sheriff responded and escorted BJ Kerr from our home." She included a picture as an exhibit featuring scratches on her lower back.

¶50. The chancellor heard testimony at trial from BJ, BJ's mother and father, India, and her father, among others. BJ vehemently denied abusing India. BJ and both his parents testified that they had witnessed India attacking BJ in the past, and his parents had never seen BJ

21

reciprocate any violence. The day after India's August 11, 2016 alleged domestic-violence incident, India's father had India involuntarily committed at Pinebelt Mental Healthcare.

¶51. The chancellor found "that no domestic abuse was committed by BJ against India on August 11, 2016, or at any other time that she alleged." In the chancellor's final judgment of divorce he noted that he agreed with the municipal judge's "order specifically [finding] that, 'the Court having considered the evidence in this cause finds that [India's] allegations of abuse are without merit and that [India] is not a victim of abuse.'" The chancellor was, thus, not required to analyze whether the presumption was or was not rebutted. *See **Rolison***, 105 So. 3d 1136.

¶52. India failed to provide credible evidence establishing by a preponderance of the evidence that BJ had committed domestic violence. This Court finds no error in the chancellor's refusal to apply the domestic-violence presumption against BJ.

**5.      Whether the chancellor's *Albright* analysis was flawed.**

¶53. India contends that the chancellor's ***Albright*** analysis was erroneous because the chancellor did not apply the rebuttable family-violence-custody presumption set forth in Mississippi Code Section § 93-5-24(9)(a)(i) against BJ, and the chancellor abused his discretion by ignoring domestic violence and other evidence supporting India having custody of WHK. Again, the chancellor did not find India's allegations of domestic abuse to be credible. As such, the chancellor had no obligation to apply the domestic-violence presumption against BJ or to weigh any of the ***Albright*** factors against BJ due to abuse

22

allegations.

¶54.    "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard. *Wells v. Smith (In re Adoption of Wells)*, 97 So. 3d 43, 46 (Miss. 2012) (citing *Johnson v. Gray*, 859 So. 2d 1006, 1012 (Miss. 2003)). "The best interest of the child is paramount in any child-custody case." *Id.* (citing *Sellers v. Sellers*, 638 So. 2d 481, 485 (Miss. 1994)). "In reviewing a chancellor's factual determinations, [this Court] may not 'arbitrarily substitute [its] judgment for that of the chancellor who is in the best position to evaluate all factors relating to the best interest of the child.'" *Gerty v. Gerty*, 296 So. 3d 704, 709 (Miss. 2020) (quoting *Tucker v. Tucker*, 453 So. 2d 1294, 1296 (Miss. 1984)).

> To help guide us to a proper determination as to custody, the court considers the following factors in determining the child's best interests: (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship.

*Lee v. Lee*, 798 So. 2d 1284, 1288 (Miss. 2001) (citing *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983)). "While the *Albright* factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula." *Id.*

¶55.    The chancellor extensively analyzed the *Albright* factors, disagreeing with the GAL's recommendations as to certain factors.  Because India contends that the chancellor did not weigh the *Albright* factors correctly, this Court reviews the chancellor's analysis in detail to determine whether he committed manifest error.

*(1) Age, Health, and Sex of the Child*

¶56.    The tender-years doctrine, a presumption that a mother is best suited to raise a young child, has been "significantly weakened" in Mississippi jurisprudence.  *Sobieske v. Preslar*, 755 So. 2d 410, 413 (Miss. 2000)  "Today, the age of the child is simply one of the factors that we consider in determining the best interests of the child."  *Id.* (quoting *Mercier v. Mercier*, 717 So. 2d 304, 307 (Miss. 1998)).  Finding that the tender-years doctrine was inapplicable because WHK was four years of age, the chancellor found that as the father of a male child, BJ was suited to care for WHK.  India argues that this factor should, at the very least, remain neutral.  The Court of Appeals in *Jackson v. Jackson*, 82 So. 3d 644, 646 (Miss. Ct. App. 2011), has considered to what extent the sex of the child may be considered. It concluded that the child's sex was indeed "a legitimate factor to consider" and

> [w]hat weight to assign to this fact in the *Albright* analysis is entrusted to the chancellor's sound discretion; a chancellor may find that it does or does not weigh in favor of the parent of the same sex as the [child], depending on the specific facts of the case.  This is a finding of fact that cannot be disturbed on appeal absent a clear showing of an abuse of discretion . . . .

*Id.* Because the chancellor may consider the sex of the children and parent in the analyzing the first *Albright* factor, the Court concludes that the chancellor did not abuse his discretion.

24

*(2) Continuity of Care*

¶57.    The GAL's report found that India was the primary caregiver from WHK's birth and during the marriage, yet it stated since the separation, this factor no longer favored India. The chancellor agreed with the GAL's recommendation as to this factor and found that it was neutral.  India argues that because **Albright** states that "a determination of the parent that has had the continuity of care *prior to* the separation," the chancellor and GAL should not consider any continuity of care subsequent to India and BJ's separation.  437 So. 2d at 1005 (emphasis added).

¶58.    But "continuity of care after separation can be considered by the chancellor." **Blakely v. Blakely**, 88 So. 3d 798, 805 (Miss. Ct. App. 2012) (citing **Jerome v. Stroud**, 689 So. 2d 755, 757 (Miss. 1997)). This Court finds no error in the chancellor's consideration of continuity of care after separation.

*(3) Parenting Skills*

¶59.    Here, the GAL's recommendation was "in stark contrast" with the chancellor's finding.  The GAL found that both India and BJ were committed to caring for WHK and thus this factor was neutral.  The chancellor, however, found that this factor favored BJ for several reasons, including India's lack of patience and level of stress.  The court quoted an email that India had sent to BJ which stated in part that "[WHK] is an absolute terror right now.  He won't sleep, eat, or mind for shit and he gets his ass torn up everyday now.  Hard red mark slams.  I can no longer handle his behavior alone."  The chancellor also noted that

India emailed BJ that WHK is "at that age where he doesn't mind and he won't calm down and listen and I just can't deal with me on my own[.] I need a fucking Valium or something stronger."

¶60. The chancellor also pointed to the court-ordered placement of WHK in preschool when BJ and India were alternating custody. The director of the preschool testified that WHK missed school thirty-two days in five months. The director stated that there was a pattern of absences that fell on the alternating weeks that India had WHK. The chancellor stated, "BJ made sure that [WHK] attended pre-school and he or a family member made sure to get him to pre-school." Upon considering that preschool was an appropriate social activity for WHK and that India chose not to take WHK to school thirty-two instances in five months, the chancellor found that this factor favored BJ.

¶61. India argues that the chancellor had no jurisdiction to order WHK's mandatory preschool attendance during India and BJ's alternating temporary custody, so she should not be penalized for violating the chancellor's order. But India did not initially oppose the chancellor's court-ordered enrollment of WHK. She also states that her father, Steve Gambrell, testified at trial that BJ's mother once bragged to him that India was a great mother. India contends that because BJ never rebutted or contradicted this specific statement, it must be taken as true. She cites *Hinds County v. Burton*, 187 So. 3d 1016, 1022 (Miss. 2016) ("When the testimony of a witness is not contradicted, either by direct evidence or by circumstances, it must be taken as true." (quoting *Hearin-Miller Transp.,*

26

*Inc. v. Currie*, 248 So. 2d 451, 454 (Miss. 1971))).

¶62.    The contention that BJ did not contradict the assertion that India was a "great mother" during the trial is simply unfounded.  BJ introduced evidence of India's unstable behavior, violence, involuntary commitment, WHK's positive drug test, among other things.  ***Burton*** does not require a party to explicitly contradict every conclusory assertion of a witness.  The Court thus finds no error in the chancellor's analysis of the above factor.

> *(4) Willingness to Provide Primary Child Care* and *(5) Employment of the Parties and Responsibilities of that Employment*

¶63.    The chancellor found "that [these] factor[s] slightly favor[ed] India because she doesn't have steady employment with routine work hours and she has more flexibility in her schedule to care for [WHK]."   The chancellor noted "[o]n the other hand, BJ is employed full-time and works out of town for Sanderson Farms, however, his mother lives with him so that she can provide back up care for [WHK] if BJ has to be gone because of work."  India does not take issue with the chancellor's findings and conclusions under this factor.

¶64.    The chancellor agreed with the GAL, stating that "ultimately this factor favors BJ because [he] is the one making an income to provide for [WHK]."  BJ's work schedule required him to work out of town as an engineer, but the chancellor noted, "he has rearranged his schedule to minimize being out of town."  India argues that simply because BJ is the primary wage earner does not mean that he should prevail under this factor.  This naked assertion is not an abuse of the chancellor's discretion.

> *(6) Physical and Mental Health and Age of the Parties*

¶65. The chancellor ordered psychological evaluation of both parties. The evaluating doctor found that India has generalized anxiety disorder. The chancellor concluded that because India was no longer receiving treatment for the anxiety, which was severe, this factor favored BJ. The chancellor gave special weight to India's behavior during the marriage and her involuntary commitment. India argues that the chancellor was incorrect. She claims that there is not evidence that her anxiety detrimentally impacted WHK, which, according to her, "should be the focus of the *Albright* analysis."

¶66. India also claims that the chancellor misinterpreted her commitment record. According to India, after the required evaluations, India was referred for outpatient therapy for anxiety and was not committed. She seeks to "further illustrate the chancellor's manifest error in this case" by stating that "the chancellor who found in the instant divorce case that India had been 'committed' is the same chancellor who found in the commitment case that India '. . . is not in need of involuntary commitment based upon the examination of West Way Behavioral HealthCare.'" This is an incorrect quote from the order of dismissal. The chancellor ordered that India "is not in need of involuntary *inpatient* commitment." (Emphasis added.)

¶67. India's father sought involuntary commitment on August 12, 2016, and India was examined and treated until August 19, 2016. At the time of her intake, outpatient commitment was not an option because she was "possibly a danger to self—'I want to die.'" It was after those eight days that India was released from services at Westway Behavioral

Healthcare and referred for outpatient services to assist with her anxiety issues.

¶68. India argues that the chancellor committed reversible error by failing to make certain required written findings. The chancellor was not required to find that India's anxiety has had a detrimental impact on WHK. Even if he were, "if the chancellor has made no specific findings, we generally proceed on the assumption that she resolved all such fact issues in favor of the appellee." *Blakely*, 88 So. 3d at 801 (citing *Ferrara v. Walters*, 919 So. 2d 876, 881 (Miss. 2005)). The chancellor addressed every issue in his final judgment. The chancellor correctly took into consideration that India's father had sought a writ for involuntary commitment and that she had stayed at the behavioral-health center for eight days for treatment. We find that the chancellor made an accurate finding on this factor.

*(7) Emotional Ties of the Parties and Child*

¶69. Both the chancellor and the GAL agreed that this factor was neutral because WHK had a close relationship with both parents. India agrees with this finding, so we decline to address it further.

*(8) Moral Fitness of the Parties*

¶70. The chancellor agreed with the GAL "that both parties had criminal charges pressed against them, but neither of them were ever prosecuted, the matters were dropped, and the GAL found this factor to be neutral." India argues that this factor should favor her because the chancellor ignored BJ's domestic violence against her. As discussed at length above, the chancellor found that India's allegations were false and therefore properly analyzed this

factor without giving weight to her claims.

*(9) Child's Home, School, and Community Record*

¶71. On this factor, the GAL and the chancellor came to different conclusions. The GAL found this factor to be neutral. The GAL acknowledged WHK's excessive absences from First Trinity Daycare on the weeks that India had custody of WHK. The GAL, however, could not find caselaw requiring a parent to take a non-school-aged child to daycare during their custodial periods. The GAL did not think that India should be required to bring WHK to daycare. In her report, the GAL stated "the minor child is so young that he is not otherwise involved in the community."

¶72. In the final judgment, the chancellor disagreed, stating:

> Testimony at trial was that [WHK] had excessive absences from the program because India didn't take him to the pre-school. The GAL felt there was no adverse impact on [WHK] for not attending school and he was so young that he wasn't involved in the community. The Court disagrees with the GAL on this factor and finds that [WHK] would have benefitted from the educational program at the pre-school, socialization with other children, and the routine of going there daily. This factor is given additional weight by the Court and favors BJ.

¶73. India argues that "[s]imply put, the chancellor again placed too much emphasis on the child's pre-school absences." It is, however, "for the chancellor to determine the credibility and weight of evidence." *Powell v. Ayars*, 792 So. 2d 240, 243 (Miss. 2001) (citing *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994)). This Court affirms the chancellor's conclusion.

*(10) Preference of the Child*

30

¶74. The chancellor found that WHK was too young to express a preference and that this factor was neutral. India agreed with the chancellor on this factor.

*(11) Stability of Home Environment*

¶75. Both the GAL and the chancellor found that both India's and BJ's home environments were stable and safe. The chancellor found this factor to be neutral. India again argues that the chancellor should have considered her claims of domestic assault. She contends that BJ "has directly contributed to an unstable home environment." The chancellor found India's claims not credible, and, thus, the Court cannot disturb the chancellor's findings.

*(12) Other Factors*

¶76. The chancellor concluded his *Albright* analysis by finding that the GAL did not place enough emphasis on WHK's excessive absences from preschool while in India's custody or WHK testing positive for Klonopin while in India's care. In the final judgment, the chancellor specially noted the events leading to the child's positive drug test:

> BJ testified that he was supposed to get [WHK] from India on Martin Luther King day when [WHK] was two and a half years old. [WHK] was approximately two hours late being delivered to BJ and his face did not look right, but BJ thought he'd just fallen asleep. BJ's mother, Jackie, was working and they went to visit her at her place of employment. Everyone agreed that his eyes didn't look right and [WHK] was wobbling and could not walk a straight line. [BJ] decided to take him to be drug tested and [WHK] did not even wake up when they drew his blood. His test results were positive for Klonopin.

The chancellor also noted:

> India admitted that she has taken at least 13 different medicines in the last 4 years that are sedatives or antidepressants, including: Lexapro, Trazadone,

31

Ambien, Prozac, Ativan, Seraquil, Vistrol, Doxypen at Westway, Lunesta, Wellbutrin, and Klonopin. India admitted that she tested positive for benzodiazepines, Klonopin in particular, when she was committed at Westway.

The chancellor found that "[t]hese facts, combined with BJ's testimony that during the marriage India would leave pills lying around ma[de] it likely that [WHK] ingested Klonopin while in India's care.

¶77. Ultimately, the chancellor disagreed with the GAL's opinion that the parties should share joint legal and physical custody. Instead, he found that the parties should share joint legal custody with BJ having physical custody of WHK. India argues that WHK's medical record should not have been admitted and, consequently, the chancellor should not have considered it in his analysis. As discussed in detail above, WHK's medical record was not hearsay. Based on the above *Albright* analysis, and considering the deference that this Court must show to the chancellor in the exercise of his discretion, we agree with the chancellor's findings and conclude that the chancellor did not abuse his discretion.

## CONCLUSION

¶78. We are mindful that the polestar consideration in child custody cases is the best interest and welfare of the child. *Garner v. Garner*, 283 So. 3d 120, 129 (Miss. 2019) (quoting *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996)). Having reviewed the record, this Court finds that standard was applied to this custody decision. We likewise agree that sufficient evidence entitled BJ to a divorce based on cruel and inhuman treatment. We therefore affirm the decision of the trial court.

32

¶79.   **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR**