# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CT-00238-SCT

*KEMILY RANKIN*

*v.*

*KELVIN RANKIN*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 12/19/2018 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| TRIAL COURT ATTORNEYS: | JEFFERY KENDRICK HARNESS |
| | KIMBERLY WALKER NAILOR |
| | DAVID M. SESSUMS |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | KIMBERLY WALKER NAILOR |
| | JAMI L. CREWS |
| ATTORNEY FOR APPELLEE: | DAVID M. SESSUMS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.  THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED - 08/12/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     This certiorari case considers whether the Court of Appeals' decision is in conflict

with a prior published decision of this Court.  Because we find that the Court of Appeals'

decision conflicts not only with a recently published decision of this Court but also with

longstanding principles of appellate review, we reverse the decision of the Court of Appeals,

and we reinstate and affirm the judgment of the chancery court.

## FACTS AND PROCEDURAL HISTORY

¶2.     Kemily and Kelvin Rankin were married in July 2007 and had two children during the course of their marriage.  In December 2017, Kemily filed a complaint for divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences.

¶3.     At trial,

> Kemily testified that the couple's marital problems began as early as their honeymoon when Kelvin got upset with Kemily while talking to her sister on the phone, and the couple had a disagreement about her giving food to a homeless person. Kemily also recalled an instance where she arrived home from work to find her dog tied to a tree and foaming at the mouth because Kelvin had forced feces down its throat after the dog had an accident inside the house. Kemily testified that in 2008 or 2009, Kelvin pushed her once during an argument while she was pregnant and that he had kicked a suitcase in 2015 or 2016, which hit her and bruised her leg. On another occasion, after Kemily had locked her herself in the bathroom during a disagreement, Kelvin picked the lock on the bathroom door, followed her into the bathroom, and continued to yell at her. Kemily testified that Kelvin had called her a b****, wh***, stupid,[1] and dumb and that he had belittled her in front of his church congregation. She claimed that the "final straw" was when Kelvin wanted to have sex one morning, and she did not; so Kelvin yelled at her and took their children to Brookhaven, telling them, "Momm[y can't] go because she ha[s] issues." Thinking she heard Kelvin's vehicle the next day, Kemily was worried that he had come back to harm her. She testified that Kelvin had also taken the children to a hotel for a few nights and would not tell her where they were, causing her distress over their whereabouts.
>
> Kemily claimed Kelvin's behavior had affected her physical health. She testified that she suffered from intense migraines during the last five years of

---

[1] Kemily's mother testified that on one occasion she had overheard Kelvin call Kemily stupid.  **Rankin v. Rankin**, No. 2019-CA-00238-COA, 2020 WL 5905077, at *2 (Miss. Ct. App. Oct. 6, 2020).

the marriage.[2] Although she noted that her blood pressure was elevated, Kemily acknowledged she had never been diagnosed with high blood pressure. Kemily said her migraines and blood pressure had not been an issue since she separated from Kelvin in November 2017. She said Kelvin also inflicted emotional, mental, and spiritual harm on her and insisted that reconciliation with Kelvin was not in her best interests.

. . . .

Kelvin acknowledged that he and Kemily had problems throughout their marriage. He also admitted that it had made him "sick" to hear Kemily's sister on the phone, but he testified that he did not want to hinder Kemily's relationship with her family. Kelvin explained that the issue with the homeless man was about security. He denied that he had yelled at Kemily's dog all the time and berated Kemily in front of his church congregation. Kelvin admitted that he bumped into Kemily one time, but he said that it was not intentional. Kelvin also confirmed that he had kicked a suitcase, but he did not recall the suitcase hitting Kemily.[3]

According to Kelvin, Kemily did not "take any personal accountability" for anything and accepted advice from everyone except him. Kelvin admitted he followed Kemily during arguments, but he referred to his yelling as "pastor intense fellowship" and explained that he was just "naturally loud." He also acknowledged calling Kemily a b**** and a wh*** after her ex-boyfriend had emailed her.[4] Kelvin testified that he had probably said Kemily was being stupid and that they have both criticized each other and called each other dumb. Kelvin believed that reconciliation was in everyone's best interests.

*Rankin v. Rankin*, No. 2019-CA-00238-COA, 2020 WL 5905077, at *1-2 (Miss. Ct. App. Oct. 6, 2020) (footnote omitted).

¶4.     At the conclusion of Kemily's case-in-chief, Kelvin moved to dismiss the complaint

---

[2] Evidence was presented that Kemily had suffered from migraine headaches since high school. *Rankin*, 2020 WL 5905077, at *5 (Greenlee, J., dissenting).

[3] Kelvin adamantly denied ever causing Kemily physical injury.

[4] Kelvin testified that that was the only occasion he had used those terms in reference to Kemily, and he expressed regret for the incident. But Kemily maintained that Kelvin had used such language more than once.

3

for divorce and argued that the evidence "wholly, completely, [and] totally fail[ed] to make out a case for habitual cruel and inhuman treatment." The chancellor took that motion under advisement, as well as similar motions advanced following Kelvin's case and Kemily's rebuttal.

¶5.     Later, the chancellor entered a fifteen-page memorandum opinion and final judgment that denied Kemily's complaint for divorce on the ground of habitual cruel and inhuman treatment. After recounting the evidence presented at trial and the applicable legal standards for a divorce on the ground of habitual cruel and inhuman treatment, including a 2017 amendment to Mississippi Code Section 93-5-1 (Rev. 2018),[5] the chancellor found "that the evidence presented [wa]s insufficient to grant [Kemily] a divorce on the ground of habitual cruel and inhuman treatment." Kemily timely appealed.

¶6.     On appeal, the Court of Appeals found that "there was sufficient evidence to support granting the divorce on the ground of habitual cruel and inhuman treatment" and therefore reversed the chancellor's judgment and remanded the case "for further findings in accordance with [its] opinion." *Rankin*, 2020 WL 5905077, at *1.

¶7.     Kelvin filed a petition for writ of certiorari and argued that the Court of Appeals' decision was (1) in direct conflict with well-established law regarding appellate review and (2) in direct conflict with a prior decision of this Court. We granted the petition.

**STANDARD OF REVIEW**

---

[5] Section 93-5-1 was amended, effective July 1, 2017, to include "spousal domestic abuse" as a form of habitual cruel and inhuman treatment. S.B. 2680, Reg. Sess., 2017 Miss. Laws ch. 427, § 6 (codified as amended at Miss. Code Ann. § 93-5-1 (Rev. 2018)).

4

¶8.     "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review." *Mabus v. Mabus*, 890 So. 2d 806, 810 (Miss. 2003) (citing *McNeil v. Hester*, 753 So. 2d 1057, 1063 (Miss. 2000)).  "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Holloman v. Holloman*, 691 So. 2d 897, 898 (Miss. 1996) (citing *Mount v. Mount*, 624 So. 2d 1001, 1004 (Miss. 1993)).  "A chancellor's conclusions of law are reviewed de novo." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (Miss. 2009) (citing *Chesney v. Chesney*, 910 So. 2d 1057, 1060 (Miss. 2005)).

**ANALYSIS**

¶9.     A divorce on the ground of habitual cruel and inhuman treatment requires the following to be shown by a preponderance of the evidence:

> [C]onduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Wangler v. Wangler*, 294 So. 3d 1138, 1143 (Miss. 2020) (alteration in original) (quoting *Osborne v. Osborne*, 202 So. 3d 639, 641 (Miss. Ct. App. 2016)).  "Divorces based upon habitual cruel and inhuman treatment are necessarily fact-intensive and require a case-by-case analysis." *Littlefield v. Littlefield*, 282 So. 3d 820, 827 (Miss. Ct. App. 2019) (citing James Shelson, *Mississippi Chancery Practice* § 38.5 (2019)).  "The offending spouse's conduct . . . 'must be shown to have been systematic and continuous.'" *Wangler*,

5

294 So. 3d at 1143 (internal quotation marks omitted) (quoting *Baggett v. Baggett*, 246 So. 3d 887, 892 (Miss. Ct. App. 2017)). "The conduct must consist of something more than unkindness or rudeness or mere incompatibility or want of affection." *Id.* (internal quotation marks omitted) (quoting *Osborne*, 202 So. 3d at 641). Additionally, "the offended spouse must show a causal connection between the offending spouse's conduct and the impact on the offended spouse." *Id.* (internal quotation mark omitted) (quoting *Baggett*, 246 So. 3d at 892).

¶10. The Court of Appeals found that the chancellor "erred in *summarily concluding* there was insufficient evidence of habitual cruel and inhuman treatment . . . ." *Rankin*, 2020 WL 5905077, at *4 (emphasis added). According to the court, "Kemily presented sufficient evidence, which *if believed*, established that Kelvin's behavior negatively affected her overall demeanor and caused her physical harm (e.g., migraines and elevated blood pressure)." *Id.* (emphasis added). In reaching that conclusion, the Court of Appeals noted that

> *[h]ad the chancery court found that Kemily's testimony lacked credibility, we would agree* with the dissent *and defer to the [chancery] court's discretion in such matters.* But the chancery court's order made *no such determination*, and we cannot conclude that the court's determination of insufficient evidence is supported by the record.

*Id.* at *4 n.3 (emphasis added).

¶11. Kelvin asserts that the Court of Appeals' decision "ignores clear, well-established and longstanding principles of [appellate] review and [is] in direct conflict with . . . the presumption required on review." He further asserts that the Court of Appeals' decision conflicts with this Court's prior decision in *Wangler*, 294 So. 3d 1138. We agree.

6

¶12. The Court of Appeals' decision is based on the absence of an express finding by the chancellor regarding Kemily's credibility. *See Rankin*, 2020 WL 5905077, at *4 n.3. It is true that the chancellor did not make a specific finding regarding Kemily's credibility. In other words, the chancellor did not specifically state that she failed to find Kemily's testimony credible. But "[a] corollary principle is that with respect to issues of fact where the chancellor made no specific finding[,] we are required to assume that the chancellor resolved all such fact issues in favor of [the] appellee." *Smith v. Todd*, 464 So. 2d 1155, 1157 (Miss. 1985) (citing *Marascalco v. Marascalco*, 445 So. 2d 1380 (Miss. 1984)); *see also Horrigan v. Ladner (In re Estate of Horrigan)*, 757 So. 2d 165, 168 (Miss. 1999) ("With regard to issues of fact as to which the chancellor did not make a specific finding, this Court is required to assume that the chancellor resolved all such factual issues in favor of the appellee." (citing *Bryant v. Cameron*, 473 So. 2d 174, 179 (Miss. 1985))).

¶13. Recently, in *Wangler*, this Court found that the wife had failed to show sufficient evidence of habitual cruel and inhuman treatment and therefore affirmed the chancellor's dismissal of her complaint for divorce. *Wangler*, 294 So. 3d at 1140. Notably, in *Wangler*, "the chancellor gave no indication that he disbelieved [the wife] or that he failed to find her credible." *Id.* at 1151 (Kitchens, P.J., concurring in part and dissenting in part). Nevertheless, this Court still affirmed the chancellor's dismissal of the wife's complaint for divorce on the ground of habitual cruel and inhuman treatment. *Id.* at 1140. In so holding, this Court noted that "the record show[ed] that the chancellor considered the testimony, pleadings, and exhibits admitted at trial." *Id.* at 1147 n.5.

7

¶14. Here, as in ***Wangler***, "the chancellor gave no indication that [s]he disbelieved [Kemily] or that [s]he failed to find her credible." ***Id.*** at 1151 (Kitchens, P.J., concurring in part and dissenting in part). But even in the absence of a specific, express finding on Kemily's credibility, "we are required to assume that the chancellor resolved [this] fact issue[] in favor of [Kelvin]." ***Smith***, 464 So. 2d at 1157 (citing ***Marascalco***, 445 So. 2d at 1380).

¶15. Despite this longstanding principle of appellate review, the Court of Appeals failed to recognize the required assumption "that the chancellor resolved [the credibility] issue[] in favor of [Kelvin]." ***Id.*** (citing ***Marascalco***, 445 So. 2d at 1380). We agree with Kelvin that the Court of Appeals' decision conflicts with this Court's prior decision in ***Wangler***. Indeed, ***Wangler***, as well as the principles of appellate review discussed above, undermine the Court of Appeals' decision.[6]

¶16. Kemily asserts that ***Wangler*** is distinguishable because, unlike in ***Wangler***, she showed "that [Kelvin]'s behavior caused her health problems (migraines)" and because she presented "undisputed testimony of at least two (2) instances of actual physical contact [by] [Kelvin]." But as the Court of Appeals' dissenting opinion properly notes,

> [W]hile Kemily testified that she suffered from migraines and elevated blood pressure when she lived with Kelvin, she testified that she was diagnosed with migraines in high school and that she was never diagnosed with high blood pressure. Therefore, unlike the majority, I cannot say that Kemily established that Kelvin's behavior negatively affected her overall demeanor and caused her physical harm.

---

[6] The Court of Appeals' majority opinion did not address this Court's decision in ***Wangler***. In fact, the Court of Appeals' majority opinion neither referenced nor distinguished ***Wangler***.

8

. . . .

Kemily argues that Kelvin physically abused her when he kicked a suitcase and pushed her in the hallway. Although Kelvin admitted that he kicked the suitcase, he did not recall the suitcase hitting Kemily. Additionally, Kelvin said that he did not intentionally bump into Kemily in the hallway. During Kemily's cross-examination, Kelvin's attorney stated, "[O]n Page 5 of your Interrogatory responses . . . it says, ['D]uring our second year of marriage, Kelvin yelled at me and pushed me . . . ["]accidentally["] while following me . . . .'" Kelvin's attorney then asked Kemily, "Is that testimony in your sworn answers to Interrogatories true?" and Kemily responded, "As far as I know."

Furthermore, Kemily seemingly conceded that Kelvin's conduct did not rise to the level of physical abuse when she testified that Kelvin's harm "has always been emotionally, mentally, and spiritually."

*Rankin*, 2020 WL 5905077, at \*5 (Greenlee, J., dissenting) (alterations in original).

¶17. The dissent asserts that "[t]he chancellor did not conduct a subjective inquiry into how Kelvin['s] . . . emotional and verbal abuse had affected Kemily . . . and the court's ruling was not based on Kemily['s] . . . subjective belief." Diss. Op. ¶ 24. The dissent then reweighs the trial court testimony and evidence and concludes that the chancellor "erred by denying [Kemily's] complaint for divorce on the ground of habitual cruel and inhuman treatment." Diss. Op. ¶ 30. But this Court will not reweigh the testimony and evidence and substitute its judgment for that of the chancellor. *See Coggin v. Coggin*, 837 So. 2d 772, 774 (Miss. Ct. App. 2003) ("The Court will not substitute its judgment for that of the chancellor, even if this Court disagrees with the findings of fact and would arrive at a different conclusion." (citing *Richardson v. Riley*, 355 So. 2d 667, 668 (Miss. 1978))).

¶18. Here, as in *Wangler*, "the record shows that the chancellor considered the testimony, pleadings, and exhibits admitted at trial." *Wangler*, 294 So. 3d at 1147 n.5. "This Court

9

gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses' testimony and the parties' behavior." *Id.* at 1147 (internal quotation marks omitted) (quoting *Hoffman v. Hoffman*, 270 So. 3d 1121, 1127 (Miss. Ct. App. 2018)). "[I]t was within the chancellor's discretion to consider the particular nuances of this case, weigh the evidence, and determine that the proof fell short of habitual cruel and inhuman treatment." *Gwathney v. Gwathney*, 208 So. 3d 1087, 1090 (Miss. Ct. App. 2017). "Simply because the chancellor denied Kemily's request for a divorce does not mean [the chancellor] did not consider how Kelvin's conduct affected Kemily." *Rankin*, 2020 WL 5905077, at *5 (Greenlee, J., dissenting). Indeed, the chancellor issued a fifteen-page opinion and final judgment that recounted the evidence presented at trial, as well as the applicable legal standards, before finding that the "evidence presented [wa]s insufficient" for a divorce on the ground of habitual cruel and inhuman treatment.

¶19.    Thus, we disagree with the Court of Appeals' assertion that the chancellor "*summarily conclud[ed]* there was insufficient evidence of habitual cruel and inhuman treatment . . . ." *Rankin*, 2020 WL 5905077, at *4 (emphasis added). Instead, we find the chancellor's decision was supported by substantial evidence and was not manifestly wrong or clearly erroneous. Additionally, assuming, as we must, that the chancellor resolved the credibility issue in favor of Kelvin, it appears the Court of Appeals agrees that the chancellor's decision was adequately supported by substantial evidence. *See Rankin*, 2020 WL 5905077, at *4 n.3 ("Had the chancery court found that Kemily's testimony lacked credibility, we would agree

10

with the dissent and defer to the court's discretion in such matters.").

## CONCLUSION

¶20.    We find the chancellor's decision is supported by substantial evidence, the decision is neither manifestly wrong nor clearly erroneous, and an erroneous legal standard was not applied. *Holloman*, 691 So. 2d at 898. Although the chancellor did not make specific findings regarding Kemily's credibility, "we are required to assume that the chancellor resolved all such fact issues in favor of [Kelvin]." *Smith*, 464 So. 2d at 1157 (citing *Marascalco*, 445 So. 2d at 1380). As a result, we reverse the decision of the Court of Appeals, and we affirm the chancery court's denial of the complaint for divorce on the ground of habitual cruel and inhuman treatment.

¶21.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶22.    In assessing the impact of Kelvin Rankin's abusive behavior on Kemily Rankin, the evidence leads to the conclusion that Kelvin Rankin's continuous emotional and verbal abuse amounted to much more than unkindness, rudeness, incompatibility, or want of affection. This pattern of behavior on his part satisfies Mississippi Code Section 93-5-1's spousal domestic abuse provision.

¶23.    In 2017, the legislature amended Mississippi Code Section 93-5-1 to provide:

11

Spousal domestic abuse may be established through the reliable testimony of a single credible witness, who may be the injured party, and includes, but is not limited to:

That the injured party's spouse attempted to cause, or purposely, knowingly, or recklessly caused bodily injury to the injured party, or that the injured party's spouse attempted by physical menace to put the injured party in fear of imminent serious bodily harm; or

That the injured party's spouse engaged in a *pattern of behavior* against the injured party of threats or intimidation, *emotional or verbal abuse*, forced isolation, sexual extortion or sexual abuse, or stalking or aggravated stalking as defined in Section 97-3-107, if the pattern of behavior *rises above the level of unkindness or rudeness or incompatibility or want of affection*.

Miss. Code Ann. § 93-5-1 (Rev. 2018) (emphasis added). This statutory amendment applies to the seventh ground for divorce, habitual cruel and inhuman treatment. By amending the statute, "the legislature relaxed the strict burden previously required for the granting of a divorce based on the ground of habitual cruel and inhuman treatment by permitting the granting of a divorce on this ground based on 'spousal domestic abuse.'" ***Wangler v. Wangler***, 294 So. 3d 1138, 1148 (Miss. 2020) (Kitchens, P.J., concurring in part and dissenting in part). "The 2017 amendment to Section 93-5-1 leaves no room to doubt that the legislature intended to make obtaining a divorce on the ground of habitual cruel and inhuman treatment easier than previously was possible in Mississippi." ***Id.*** at 1152. Section 93-5-1 now states explicitly that a pattern of emotional or verbal abuse that "rises above the level of unkindness or rudeness or incompatibility or want of affection"[7] is spousal domestic

---

[7]The word *unkind* is defined as "not pleasing or mild . . . . lacking in kindness or sympathy." *Unkind*, Webster's Ninth New Collegiate Dictionary (9th ed. 1983). *Rude* is defined as "[i]ll-mannered; un-civil; discourteous." *Rude*, The American Heritage Dictionary of the English Language (1981). *Incompatibility* is defined as "[t]he state or quality of being incompatible; lack of harmony or consistency; disagreement; incongruity." *Incompatibility*,

abuse, which constitutes habitual cruel and inhuman treatment and warrants a divorce for the injured party. Miss. Code Ann. § 93-5-1. Here, most of Kelvin Rankin's bad conduct was in the form of emotional and verbal abuse.

¶24. The majority misapplies a portion of my separate opinion in *Wangler* in which I noted that "the chancellor gave no indication that he disbelieved [the wife] or that he failed to find her credible." Maj. Op. ¶ 13 (internal quotation marks omitted) (quoting *Wangler*, 294 So. 3d at 1140 (Kitchens, P.J., concurring in part and dissenting in part)). My analysis in *Wangler* did not depend upon whether the chancellor found one spouse more credible than the other. Instead, it focused on the chancellor's failure to conduct a subjective inquiry and his not having considered the husband's abusive behavior as a whole as required by law. *See Faries v. Faries*, 607 So. 2d 1204, 1209 (Miss. 1992) ("This Court has held that impact of the conduct on the plaintiff is crucial, thus we employ a subjective standard."); *Rakestraw v. Rakestraw*, 717 So. 2d 1284, 1288 (Miss. Ct. App. 1998) ("[T]here are many kinds of acts such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty." (internal quotation marks omitted) (quoting *Savell v. Savell*, 240 So. 2d 628, 629 (Miss. 1970))). The same is true here. The chancellor did not conduct a subjective inquiry into how Kelvin Rankin's emotional and verbal abuse had affected Kemily Rankin, and the court's ruling was not based on Kemily Rankin's subjective belief.

The American Heritage Dictionary of the English Language (1981). The word *want* is defined as "[t]o fail to have; be without; lack." *Want*, The American Heritage Dictionary of the English Language (1981). *Affection* is defined as "[a] fond or tender feeling toward another." *Affection*, The American Heritage Dictionary of the English Language (1981).

By failing to consider how Kelvin Rankin's behavior had impacted Kemily Rankin, "[the trial court] simply did not recognize that the spousal malevolence she described was statutorily sufficient to establish this ground for divorce." *Wangler*, 294 So. 3d at 1151 (Kitchens, P.J., concurring in part and dissenting in part).

¶25. Even if the credibility issue is assumed to be in Kelvin Rankin's favor, his testimony corroborated Kemily Rankin's accounts of his abuse of her. Both acknowledged that their marital troubles began as early as their honeymoon. Both admitted that Kelvin Rankin had kicked a suitcase, but he could not recall whether the suitcase had injured his wife as she claimed. Both admitted that he yelled at Kemily Rankin, although Kelvin Rankin described those encounters as "pastor intense fellowship." Both acknowledged that when Kemily Rankin had tried to escape her husband's "pastor intense fellowship," *i.e.*, yelling, he would follow her, even after they were separated by a locked door, and would continue to yell at her. Both admitted that he had called her derogatory names. Kelvin Rankin admitted also that he even had criticized how his wife cut cornbread, testifying that "[s]he doesn't know utensils."

¶26. Kelvin Rankin did not deny that he had engaged in all of these actions; instead, his testimony sought to explain his actions. As the Court of Appeals majority determined correctly, "Kelvin's defense for his behavior was simply to say that Kemily fails to take 'personal accountability,' in essence, placing the blame on Kemily for his anger. Furthermore, Kevin [sic] provided no evidence to dispute that his behavior, regardless of his intent or motive, adversely impacted Kemily." *Rankin v. Rankin*, No. 2019-CA-00238-

14

COA, 2020 WL 5905077, at *4 (Miss. Ct. App. Oct. 6, 2020). Ultimately, the difference between the spouses' testimonies are in each one's subjective views of Kelvin Rankin's conduct. In that regard this Court has held that:

> There is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse. *Fisher* [*v. Fisher*, 771 So. 2d 364, 368 (Miss. 2000)]. The effect of the conduct on the offended spouse is determined by a subjective standard, which is to say that an attempt is made to weigh the likely effects of the conduct on the offended spouse, as opposed to a normative standard. *Morris v. Morris*, 783 So. 2d 681, 688 (Miss. 2001); *Talbert v. Talbert*, 759 So. 2d 1105, 1110 (Miss. 1999); *Faries*[, 607 So. 2d at 1209].

*Bodne v. King*, 835 So. 2d 52, 59 (Miss. 2003). "This Court has held that [the] impact of the conduct on the plaintiff is *crucial*[.]" *Faries*, 607 So. 2d at 1209 (emphasis added). "While Kelvin [Rankin] may have thought it was fine for him to pick the lock, corner Kemily [Rankin] in the bathroom (where she hid for safety), and continue to yell at her in an attempt to 'resolve' their argument, it did not make his actions any less upsetting to her." *Rankin*, 2020 WL 5905077, at *4. When asked how he thought his behavior had affected his wife, Kelvin Rankin responded, "I can't speak for Kemily. Evidently, *she's very upset* about that, but again, I haven't heard anything about personal responsibility yet." (Emphasis added.) With this testimony, he corroborated that his pattern of behavior had affected Kemily Rankin negatively by causing her to be very upset. The trial court "realize[d] that the parties may be unable to live together in the future; however, this [c]ourt is bound to apply the law." But the trial court missed that mark because it considered Kelvin Rankin's explanations of his conduct over Kemily Rankin's expression of how his conduct had affected her. Our precedent mandates that the chancellor consider the impact of the offending spouse's conduct

15

on the offended spouse. The trial court should have focused on how Kelvin Rankin's conduct toward Kemily Rankin had affected her. In cases such as this one, in which most of the offending spouse's conduct is in the form of verbal and emotional abuse, the need to conduct a subjective inquiry is all the more imperative, since these forms of abuse are less visible than physical abuse, *i.e.*, a black eye or a broken bone.[8]

¶27. The majority says that the Court of Appeals dissent "properly notes" that Kemily Rankin failed to establish that Kelvin Rankin's "behavior negatively affected her overall demeanor and caused her physical harm." Maj. Op. ¶ 16 (quoting *Rankin*, 2020 WL 5905077, at *5 (Greenlee, J., dissenting)). But it is not necessary that the pattern of abusive behavior cause the offended spouse to suffer actual physical harm. *See McNeill v. McNeill*, 125 Miss. 277, 87 So. 645, 646 (1921) ("In order that the complaining party may be entitled to relief, it is not necessary that danger to life or health shall in fact exist; but if the acts of cruelty are such as to create in the mind of the complainant a reasonable apprehension of such danger, relief should be granted."). However, it is required that "a spouse seeking divorce on the ground of habitual cruel and inhuman treatment must offer proof as to *causal connection* between cruel treatment complained of and spouse's separation from household." *Faries*, 607 So. 2d at 1209 (emphasis added) (citing *Fournet v. Fournet*, 481 So. 2d 326, 329 (Miss. 1985)). We have held that "[p]hysical violence directed at the offended spouse

_____

[8]"In cases involving serious physical abuse, the impact on the plaintiff is obvious. Cases involving physical abuse often grant divorce without discussing the requirement of impact on the plaintiff. In cases involving more isolated incidents combined with verbal abuse, however, it may be important to provide evidence of the impact on the plaintiff." Deborah H. Bell, *Bell on Mississippi Family Law* § 5.03[2] (2d ed. 2011) (footnote omitted).

is not required." ***Bodne***, 835 So. 2d at 58 (citing ***Richard v. Richard***, 711 So. 2d 884, 889 (Miss. 1998)). Moreover, the amendment to Section 93-5-1 does not require actual physical harm to have occurred as it encompasses two types of conduct: 1) conduct that does or can cause bodily injury and 2) conduct that is not physical, *i.e.*, threats or intimidation or emotional/verbal abuse, that make up a pattern of behavior that is more than unkindness or rudeness or incompatibility or want of affection.

¶28.    The absence of actual physical harm does not support a denial of divorce on this ground because habitual cruel and inhuman treatment can be in the form of conduct that "creates a reasonable apprehension of such danger" to life, limb, or health and the conduct "render[s] the relationship unsafe for the offended party[.]" ***Bodne***, 835 So. 2d at 58 (citing ***Daigle v. Daigle***, 626 So. 2d 140, 144 (Miss. 1993)). Kemily Rankin testified regarding the "final straw" that led to her understanding she needed to get away from her abusive marriage. She testified that one morning, she refused to have sex with Kelvin Rankin, which led to his yelling at her until she left to participate in a walk-a-thon. When she returned from the event, Kelvin Rankin yelled at her until she left to go to a store. Upon returning from the store, her husband proceeded to yell at her again. After yelling at her continuously, Kelvin Rankin, in anger, took the children to Brookhaven without her and told the children that "Mommie couldn't go because she had issues." The next day, Kemily Rankin was awakened by the sound of a truck coming up the driveway. She feared that her husband had come back to hurt her. She testified that it was during this state of fear that she realized she had to leave, "because the feeling was so real that [she], honestly, thought that he had come back to hurt

17

[her]." This incident illustrates that, at the very least, Kelvin Rankin's pattern of emotional and verbal abuse had created in the mind of Kemily Rankin a reasonable apprehension of danger to her life, limb, or health.

¶29.    "One set of conduct evincing habitual cruel and unusual conduct is ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse which cause such mental suffering as to destroy health and endanger the life of an innocent spouse." *Id.* at 59 (citing *Chamblee v. Chamblee*, 637 So. 2d 850, 859 (Miss. 1994)). Here, Kelvin Rankin's continuous emotional and verbal abuse damaged Kemily Rankin's emotional and mental health. Her testimony established that Kelvin Rankin's conduct toward her affected her health negatively. She testified that her husband's

> harm to [her] has always been emotionally, mentally, and spiritually. That is what he does his damage. . . . [H]e specialized in, in mental abuse. And that is what he did. So, the physical abuse, I probably could have handled that ten times better than the mental abuse that I had to suffer at his hand for those ten years I stayed in the home with him.

She testified also that "[i]t was just constant abuse. It was just constant yelling and screaming and berating. I was always on eggshells." Her testimony demonstrates that Kelvin Rankin's repeated pattern of emotional and verbal abuse made her feel "very fearful" and "always on eggshells." When considering Kelvin Rankin's pattern of behavior as a whole and its impact on Kemily Rankin, it is clear that his continuous emotional and verbal abuse rose above the level of unkindness or rudeness or incompatibility or want of affection.

¶30.    Because Kemily Rankin provided sufficient evidence that her husband's repetitive emotional and verbal abuse negatively impacted her and caused her to feel unsafe over a

protracted period of time, the trial court erred by denying her complaint for divorce on the ground of habitual cruel and inhuman treatment. Therefore, I would reverse the decision of the Chancery Court of Warren County and render a divorce in Kemily Rankin's favor.

**KING, P.J., JOINS THIS OPINION.**